Filed 5/13/22  Nolan v. Ford Motor Company CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| SHAWN NOLAN et al., | |
| Plaintiffs and Appellants, | E073850 |
| v. | (Super.Ct.No. RIC1307491) |
| FORD MOTOR COMPANY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.

Affirmed in part, reversed in part, and remanded with directions.

Lewis Brisbois and Paul Efstratis; Sanders Roberts, Justin H. Sanders, and Sabrina C. Narain; and Jones Day, Nathaniel P. Garrett, David J. Feder, Margaret A. Maloy, and Emily F. Knox for Defendant and Appellant.

Rosner, Barry & Babbitt, Hallen D. Rosner, and Arlyn L. Escalante; Knight Law Group, Roger R. Kirnos, Lauren A. Ungs, and Christopher E. Swanson; the Altman Law Group and Bryan C. Altman; Greines, Martin, Stein & Richland, Cynthia E. Tobisman for Plaintiffs and Appellants.

1

Husband Jerry Nolan and wife Shawn Nolan bought a new Ford Excursion[1] from a Ford dealership. They chose to buy it with a 6.0-liter diesel engine (6.0L engine), because Ford and the dealership both represented that engine as higher-quality and longer-lasting. In fact, the truck — and especially the engine — required repair after repair. Several times, it lost power. Once, it broke down and left the Nolans and their children stranded halfway to Lake Havasu. By the time it had 120,000 miles on it, it had massive oil leaks and was mostly inoperable.

The Nolans' expert testified that the 6.0L engine had a defective air management system. Stuck or mistimed fuel injectors caused incomplete combustion. Unburned hydrocarbons built up on and eventually clogged up the turbocharger and the exhaust gas recirculation (EGR) valve. This resulted in loss of power, oil leaks, and early part failures, among other things.

Over Ford's objections, the Nolans introduced a number of internal Ford emails and other internal Ford documents. These showed that Ford had learned that certain parts of the 6.0L engine, including fuel injectors, turbochargers, and EGR valves, were failing at excessive rates. Some emails said that this information should be kept secret.

The Nolans sued Ford, asserting causes of action premised on fraud (under common law and under the Consumers Legal Remedies Act [CLRA], Civ. Code, § 1750 et seq.) and on breach of warranty (under the Song-Beverly Consumer Warranty Act,

---

**1** An Excursion is an SUV. Nevertheless, at trial and on appeal, both sides have consistently referred to it as a truck. We follow their usage.

2

Civ. Code, § 1790 et seq. [Song-Beverly or Song-Beverly Act].). A jury found for the Nolans on all causes of action; it awarded $59,634.91 in compensatory damages, an additional $59,634.91 as a statutory penalty, and $8.125 million in punitive damages. The trial court reduced the punitive damages to $1 million.

Ford appeals. It contends that:

(1) The trial court erred by admitting the internal Ford emails and other documents, because they were inadmissible hearsay.

(2) The trial court erred by admitting depositions of Ford employees taken in a former action, because they were inadmissible hearsay.

(3) The trial court erred by allowing an expert to testify about the "industry standard" punitive damages award.

(4) The jury's damages awards under the CLRA and for common-law fraud are inconsistent.

(5) The jury's damages award under the CLRA is not supported by substantial evidence.

(6) The Nolans cannot recover both a statutory penalty and punitive damages.

(7) The $1 million punitive damages award is unconstitutionally excessive.

The Nolans cross-appeal. They contend that:

(8) The trial court erred by denying preverdict interest and by basing its award of interest between the verdict and the entry of judgment on the wrong interest rate.

3

We will hold that the trial court erred by admitting the emails without a limiting instruction; however, the emails were admissible as evidence of Ford's knowledge, and the trial court's failure to give a limiting instruction was not prejudicial. We will also hold that the $1 million punitive damages award is unconstitutionally excessive and must be reduced to $536,714.19. Otherwise, we find no error that has been preserved for appeal. Hence, we will modify and affirm.

I

STATEMENT OF FACTS

A.    *The Nolans' Problems with the Truck.*

Mr. Nolan worked as an independent contractor delivering bakery products to stores. Ms. Nolan worked for Costco.[2] They had three children.

In March 2004, the Nolans bought a new 2004 Ford Excursion from a franchised Ford dealership in Riverside. The total purchase price was $56,899.80. They made a $29,350 down payment, traded in a Chevrolet Suburban, and financed the rest.

They were looking for a vehicle that would accommodate the whole family when they went on trips. They were also looking for "longevity."

The Excursion was offered in both gas and diesel versions. Initially, the Nolans intended to buy a truck with a gas engine. According to Ford dealership salespeople and Ford brochures, however, the 6.0L engine "was the newest, biggest, best thing out there,"

---

[2]    In 2014, Mr. Nolan also went to work for Costco, as a tire installer.

4

with "best in class performance," and it would last "twice, if not three times" as long as a gas engine. They therefore bought a truck with the 6.0L engine.

The truck came with a warranty for three years or 36,000 miles, plus a powertrain warranty for five years or 100,000 miles. The Nolans bought an extended warranty, with a $100 deductible, for $2,900.

Ms. Nolan was the primary driver of the truck. At first, it "[r]an great."

In October 2004, however, when the truck had 8,204 miles on it, the Nolans had it towed in to a dealership. According to them, there was a "complete failure of the power steering and the brake system." The truck would "go[] straight through" "a stoplight[] or a stop sign"; they had "no control over it." The dealership found and fixed a power steering fluid leak and replaced the brake booster assembly.

Starting in December 2004, the Nolans had a problem with the fit of the front doors. "When [they] went down the freeway, it sounded like a tornado going through the truck." They had to take it in to a dealership four times before the problem was fully fixed.

At some point, the Nolans were driving home from Laughlin, Nevada, towing jet skis, when the truck lost power. They "limped" home by driving slowly.

In October 2005, when there were 21,751 miles on the truck, the Nolans took it in to a dealership because it lacked power. The dealership found that the EGR valve was sticking, due to carbon build-up; it replaced the EGR valve.

In April 2006, when the truck had 27,827 miles on it, the Nolans took it in to a dealership in response to a recall (06E17 recall). The recall was to fix failures of the exhaust back pressure (EBP) sensor, which were leading to incomplete combustion. The Nolans' own EBP sensor had not failed.

In August 2007, when the truck had 43,276 miles on it, the Nolans took it in to a dealership because the check engine light was on and the truck "d[id] not operate properly." The dealership found that the turbocharger was sticking because it was rusted. It replaced the turbocharger and a cracked charge air cooler (CAC) tube.

A week later, when the truck had 43,456 miles on it, the Nolans took it back in to the dealership because the check engine light was on and the truck "lack[ed] power." The dealership replaced the manifold absolute pressure sensor and fixed an exhaust leak. The Nolans had to pay the $100 deductible under the extended warranty.

In April 2008, when the truck had 51,396 miles on it, the Nolans took it in to a dealership because of "rough running." Ms. Nolan explained that, "[a]t least once a month," it would shake when stopped and idling. The dealership found that the injector control pressure (ICP) sensor was cracked and replaced it. Also, the sensor wiring harness was contaminated with oil. The Nolans had to pay the $100 deductible.

In May 2009, when the truck had 63,857 miles on it, the Nolans were on a freeway, halfway to Lake Havasu, when the alternator and the battery died. They had the truck towed to a dealership in Lake Havasu City. The dealership found that the alternator

had failed and replaced it. The Nolans did not have the use of the truck (or a loaner) during their vacation. They had to pay the $100 deductible.

In August 2009, when the truck had 67,661 miles on it, as the Nolans were on a trip with their children, the truck started alternately losing power and then lunging forward. A dealership replaced the transmission. The Nolans had to pay the $100 deductible.

In January 2011, when the truck had 95,242 miles on it, the Nolans had it towed in to a dealership because it would not start. The dealership found that the fuel injection control module (FICM) had failed and replaced it. The Nolans had to pay the $100 deductible.

Around this time, Ms. Nolan phoned Ford to complain, but she never heard back.

In February 2012, when the truck had 104,065 miles on it, the Nolans took it in to a dealership because the check engine light was on and they smelled oil burning. The dealership found that the oil pressure sender was leaking; also, a glow plug and a harness needed to be replaced. Rather than pay the $762 quoted for repairs, the Nolans said they would do the repairs themselves. They bought the necessary parts for $170.

In August 2012, when the truck had 107,347 miles on it, it started making "loud clacking noises" and putting out "large clouds of black smoke." It had to be towed in to a dealership. The dealership found that one of the fuel injectors was stuck and needed to be replaced, the fuel injectors needed to be flushed, and the EGR cooler hose was

leaking.  It fixed all these, which cost $1,444.  It also recommended replacing the glow plug controller.  The Nolans agreed to do so, for another $776.

Ms. Nolan testified that there were times when she did not bring the truck in for repairs, even though it was not working properly, because she needed it to go to work and to take her three children to activities and appointments.  "If we . . . took that truck in as often as we needed to, we would live at Ford."  Sometimes the truck lost power in intersections and on freeways.

The Nolans stopped using the truck for trips.  As a result, they took fewer trips, and they had to take those using their other, smaller car, so sometimes not all of the family could go along.  Whether the truck would break down was always "in the back of [their] mind."

In November 2012, the Nolans learned that there was a class action against Ford involving the 6.0L engine.  They opted out, because the proposed settlement was "[p]ennies on the dollar . . . ."  Instead, in 2013, they filed this action.

In February 2015, when the truck had about 120,000 miles on it, technicians at a dealership conducted a forensic inspection of the truck, in the presence of the attorneys and the expert witnesses for both sides.  It was towed in to the dealership.  It had extensive oil leaks.  The fuel injector pressure was too low.  Two cylinders were not working properly, possibly due to fuel injector problems.  Two additional cylinders also were not working properly, due to wear.

The technicians managed to get the truck to start, so at the end of the inspection, the participants took a test drive. The truck developed a rough idle, so they turned around and headed back to the dealership. It broke down just as they arrived.

In May 2015, when the truck had 129,855 miles on it, it broke down at Ontario Airport. The Nolans had it towed in to a dealership. They reported that it "feels like it has no power and will stall"; most recently, it would not even start.

The dealership found that the wiring of the injection pressure regulator (IPR) valve was "melted together." It told the Nolans that, if this was fixed, "more than likely [they] would be able to drive out . . . and get back on the road." The Nolans authorized the repair, which cost $454. However, the truck still "start[ed] and die[d]," and the ICP pressure was too low. The dealership offered to tear down the engine to try to find the problem, but the teardown alone (not including any repairs) would cost $2,000-2,500. The Nolans declined and had the truck towed home.

The Nolans moved closer to their workplace, so one spouse or the other could get there on a bicycle.

At the time of trial, the truck was inoperable and had been sitting in a driveway for three and a half years. In Ms. Nolan's opinion, it was unsalable and had a negative value. In 2014, however, at her deposition, she had estimated that it was worth $8,000.

Reports of all work done on the truck while it was under warranty were sent to Ford's warranty claims database. Jacob Doss, Ford's Regional Escalation Manager, testified that Ford tracks warranty claims to determine whether to recommend "repairs or

9

diagnostics or [other] items."  However, it was not feasible to use warranty claims to detect a problem with a specific vehicle.

B.      *Thomas Lepper, the Nolans' Expert*.

The Nolans called Thomas Lepper  as their automotive expert.

Ford bought the 6.0L engine from Navistar, which designed and manufactured it. In Lepper's opinion, it had a "core problem with the air management system."

Fresh air enters through the turbocharger, which compresses and heats the air. The air then enters the combustion chambers.  Just as the cylinders are rising, which further compresses and heats the air, the fuel injectors spray diesel fuel into the combustion chambers.  The heat ignites the fuel, which pushes the cylinders down.  The "dirty air" goes into the EGR system, which reduces pollution by sending some of it back into the combustion chambers; the EGR valve regulates this process.  The rest of the dirty air exits through the turbocharger, providing the power that makes the turbocharger spin.

The 6.0L engine has eight cylinders, each with its own fuel injector.  The fuel injector control module (FICM) controls the timing of the fuel injectors.  The injection control pressure (ICP) sensor sends the FICM feedback on the pressure that the fuel injectors are using.  If a fuel injector is sticking or not properly timed, excessive unburned hydrocarbons leave the combustion chamber.  Some of this sticks to surfaces inside the engine, where heat turns it into baked-on coke.  Coking will "shorten the life of the engine."

10

The turbocharger has vanes, which control the speed of the air inside. Coking clogs the vanes and makes them stick. If they stick closed, there is too much pressure. This causes a power boost at low RPMs; it also causes oil leaks. On the other hand, if the vanes stick open, "you have no low [RPM] performance. You can't accelerate very fast."

Coking also clogs the EGR valve and makes it stick. If the EGR valve sticks open, it allows too much exhaust gas to reenter the combustion chamber. This results in loss of power and stalling. It also results in excess pressure, which causes cracked parts and oil leaks. If the EGR valve sticks closed, not enough air reaches the combustion chambers, so there are even more unburned hydrocarbons. Coking will also "ruin the EG[R] cooler."

Ford sold over a million vehicles with the 6.0L engine. The 6.0L engine in the Nolans' truck was "one of the worst" Lepper had ever seen.

In Lepper's opinion, the Nolans' October 2005 EGR valve replacement was due to coking. An EGR valve was supposed to last 300,000-500,000 miles. The mechanic should have looked into why it failed so early. Replacing it did nothing to fix the underlying problem.

In the 06E17 recall, in April 2006, Ford removed the EBP sensors and reprogrammed the computer. However, this did not fix the underlying problem.

In July 2007, Ford issued a technical service bulletin (TSB) to all of its dealerships about carbon deposits on the turbocharger. The TSB noted that this can cause black

smoke and loss of power. According to Lepper, it "describe[ed], almost to a tee, what happened with the Nolans . . . ."

The August 2007 replacement of the Nolans' turbocharger and CAC tube was due to coking of the turbocharger. This would cause a sudden loss of power. A Ford turbocharger was supposed to last 250,000-500,000 miles. Replacing the turbocharger did nothing to fix the underlying problem. "They are . . . putting Band-Aids on the problems as they find them." The repair just "put[] the consumer further along the line towards the expiration of their warranty[.]" In April 2008, a technician found that a fuel injector in the Nolans' truck was sticking but did not determine why. Likewise, the August 2012 fuel injector and other repairs did nothing to fix the underlying problem.

In Lepper's opinion, the July 2013 oil leak was due to incomplete combustion, which caused the turbocharger vanes to stick, which in turn caused "excessive pressure." The melted wiring in May 2015 was due to overpressurization, which causes heat.

Lepper concluded that the repair efforts were unreasonable because they were not calculated to fix the underlying problem. When each individual problem was found, the dealerships should have looked at "the combustion process of this vehicle." Instead, they did no root-cause analysis. When parts failed early in their useful life, they were simply replaced, without any analysis of why they were failing. Moreover, the sheer number of repair efforts — some 15 or 16 — was unreasonable. This was ultimately Ford's fault, because it was not telling local technicians what to look for. No one from Ford ever told the Nolans about the problems with the 6.0L engine.

12

In Lepper's opinion, the defects of the 6.0L engine significantly impaired the Nolans' safety. The defects also significantly impaired their ability to use the truck. Finally, they made the truck unsalable.

C.    *Internal Ford Emails and Presentations*.

1.    *Lepper's testimony*.

Counsel for the Nolans showed Lepper a number of internal Ford emails and other documents. He testified to what they said and commented on their meaning and significance.

Exhibit 39 consisted of two emails sent in May 2002 by Charles Freese to Ford and Navistar personnel. Freese was Ford's Chief Diesel Engineering Manager. The first email noted "open issues," including "ICP failures," "piston failures," "injector failures," and "wire harness modifications." (Capitalization altered.) Freese directed Navistar to explain "how out-of-spec injectors are being produced at such a high frequency." (Capitalization altered.) The second email noted that the "engine build kick-off" had been delayed by four days, affording time to "close" the ICP failures, piston failures, and injector failures.

Exhibit 43 was a memo or presentation dated July 2003, entitled "Launch Overview." No author was identified. It listed "current quality concerns," including "[r]ough [i]dle," "[l]ack of power when taking off with a cold engine," and "run[ning] poorly (including lower fuel economy)." Ford's "Operation Diesel Pride" was intended to "[e]nsure technical information is readily available," "[i]mprove technical assistance to

13

dealers on d[i]fficult repairs," "[c]ommunicate with [s]ales personnel on latest 6.0L issues," and "[d]evelop a special handling process for Powerstroke customers."

Exhibit 47 was an email sent in September 2004 by Frank Ligon to Ford personnel. Ligon was Director of Ford's Customer Service Division. The email was marked "privileged and confidential." It cautioned, "This is very confidential!!!" "I strongly urge that this information NOT be shared at this time until the 'official' action is announced."

It said Ford was "putting together a comprehensive strategy to bring all 6.0 up to standard." "We are seeing a new group of concerns that range from chaffing [*sic*] of various wire harnesses causing drivability concerns, sensors that are failing at a high rate and turbo concerns." "At this point we do not have a definitive repair action . . . to properly address the concern universe." "Bottom line is we are not 'out of the woods' on this 6.0 and in fact may experience repeat symptoms once certain repairs are performed . . . ."

Exhibit 189 was an email from Ligon to other Ford employees, dated October 2004. In a discussion of fuel injectors, it said his boss was "concerned that we're jeopardizing the brand . . . . "[T]here are no fixes on certain symptoms."

It attached an earlier email from John Koszewnik. Koszewnik was the Director of Ford's North American Diesel division. It said, "The cost to the company of replacing all eight injectors . . . would be over $250 million. Not a satisfactory option."

Exhibit 52 was a draft of an internal Ford PowerPoint presentation by the "Diesel Pride III Steering Committee" dated March 2005. It said that the purpose of the committee was "[t]o protect the F-Series and Powerstroke brand image in the face of ongoing quality concerns, customer issues, and potential media coverage." A "[t]imeline of major events/issues" included EBP, involving 607,441 vehicles; FICM wire chafing, involving 182,267 vehicles; ICP connector, involving 105,050 vehicles; CAC, involving 77,509 vehicles; EGR valve coking and sticking, involving approximately 317,119 vehicles; and fuel injector sticking, involving 646,533 vehicles.

Exhibit 56 was an email from Koszewnik to other Ford employees, dated October 2005. It said, "We knew that 100% of the EBP sensors would experience the gold corrosion problem." It added, "With inaccurate sensors, we also knew that we would be suffering driveability problems . . . which the data now confirms." (Ellipsis in original.)

Exhibit 61 was an email chain from Koszewnik to other Ford employees, dated January 2006. It said, "Injector warranty remains our higher warranty item and last month went through the roof . . . $9.8 million for a single month." "Bottom line, the injectors develop more stiction over time . . . which delays the start of injection . . . and results in poor/rough accel's when the engine is cold. We are getting many repairs for this issue."

In an earlier email in the same chain, Ligon said, "I am very reluctant to tell the [d]ealers there [is] no approval in place to replace . . . injectors if they felt obliged to."

15

In a still earlier email in the chain, Ligon said, "The company is going to be in trouble if we keep replacing injectors at the rate we're doing it and it seems to be getting worse."

Lepper testified that this exhibit supported his opinions "about incomplete combustion that plagued the Nolan vehicle[.]"

Exhibit 62 was a presentation entitled "6.0L Powerstroke Injector: December 2005 Warranty Claims" by Mark Freeland, dated January 2006. It said, "The following observations appear repeatedly in the [i]njector warranty claims . . . ." These included: (1) "engine makes black/blue smoke," possibly due to "too much fuel at the wrong time"; (2) "engine hesitates/surges," possibly due to "cylinder(s) misfiring because of no fuel delivered"; (3) "EGR valve stuck," possibly because it was "jammed by soot from overfueling"; and (4) "turbo vanes stuck," also possibly because it was "jammed by soot from overfueling." (Capitalization altered.)

It added, "There have been many changes made to 'fix the [i]njector' warranty issue, but none seem to have been effective to reduce the base level of the warranty [claims]." It concluded that leaks from the fuel injectors and combustion chambers were "the common cause" of fuel injector, turbocharger, EGR, fuel system, and engine component warranty claims. Lepper testified that this exhibit "supports everything that I've said." "All these things . . . are Nolan-vehicle-specific."

Exhibit 63 was a presentation by Barb Samardzich dated February 2006. Samardzich was Ford's Vice-President of Product Development. It listed "top 6.0L

16

issues," based on Ford's warranty costs. They included fuel injectors, turbochargers, EGR valves, and wiring harnesses. It referred to an "industry standard" actuation pressure for EGR valves.

Exhibit 64 was an email from John Koszewnik to other Ford employees, dated February 2006. It said, "FYI only. Don't forward or reference." It attached an earlier email by Koszewnik, saying that EGR warranty claims were "running about $36 million a year, but we have been as high as $5 million a month! A large part of this was driven by [Navistar]'s use of a 15 newton linear solenoid EGR valve versus the industry standard of a 200 newton DC motor driven valve." Ford was refusing to pay for an upgrade, because it was Navistar's fault, but Navistar was also refusing to pay.[3]

According to Lepper, using parts that are "significantly below industry standard" makes an engine "even more susceptible to coking . . . ."

Exhibit 65 was an email from Mike Frommann to another Ford employee, dated June 2006. Frommann was the Warranty Program Supervisor for purchased powertrains. It attached an earlier email, also by Frommann, saying, "We unfortunately exceeded our own cylinder pressure specs in normally performing engines. We don't want to have our cylinder pressure specs published or documented by having them subpoenaed or we might face a class action." "I recommend we delete all these emails."

Lepper testified that exceeding cylinder pressure specifications "causes incomplete combustion . . . ."

---

[3] Sometime before August 2007, Ford sued Navistar.

17

Lepper also testified that Ford never disclosed the issues identified in these documents to the Nolans.

D.      *Depositions of Ford Employees*.

Counsel for the Nolans played portions of the depositions of four current or former Ford employees.

1.      *Ligon deposition*.

Frank Ligon was a retired Ford employee. He testified that the launch of the 6.0L engine was delayed due to concerns about drivability — specifically, rough running and poor idling. These concerns were resolved before launch.

Within a few months after the launch, however, Ligon learned that the 6.0L engine still had problems with rough running and poor idling. There were also concerns about the turbocharger and the fuel injectors.

In a March 2004 email (not in our record) concerning fuel injector scuffing, Ligon had said, "The fixes are available, but there isn't a 'preventable action' the dealers can take to keep the failure from occurring." He also said, "I'm not sure how much of this we want beyond the technical community, that's why I'm restricting this to you . . . ." At some point, the scuffing concern was resolved.

Regarding Exhibit 47 (his email noting "concerns" about the 6.0L engine), Ligon testified that he marked it "confidential" because one of the recipients who was outside the technical area might "misinterpret it and tell someone."

18

In September 2004, Ligon received an email (also not in our record) from a Ford engineer headed, "6.0-liter - Save the Brand." It suggested offering 2003 and 2004 customers an extended warranty on the engine to 150,000 miles. Ligon agreed. He did not remember what became of the suggestion.

Everyone involved at Ford was concerned about resolving the problems with the 6.0L engine. In Ligon's opinion, Ford did ultimately resolve them.

        2.     *Frommann deposition*.

Mike Frommann worked for Ford as Warranty Program Manager for purchased powertrains.

In 2006, Frommann learned that a test engine had exceeded Ford's cylinder pressure "specs," but only under cold conditions. Excessive cylinder pressure could blow out a head gasket; it could also force fuel into the cooling system and "clog things." Ford had fixed the problem by recalibrating the engine. Such a recalibration "might" impact torque or horsepower.

Frommann admitted telling coworkers to delete his email about this issue (Exhibit 65), because it could be misleading. He also deleted his own copy of the email.

Frommann also admitted that the 6.0L engine had more repairs per thousand than any other Ford engine. As of June 2006, he knew that Ford's warranty expenses for it were above projections. Ford keeps track of its own warranty repair costs; however, once a vehicle is out of warranty, it does not keep track of its customers' repair costs.

### 3. *Freeland deposition*.

Mark Freeland was a retired Ford employee. While at Ford, he had given a PowerPoint presentation (inferably Exhibit 62) to Koszewnik and others. Most of the people present "strongly disagreed" with what he said.

### 4. *Eeley deposition*.

Scott Eeley was a current Ford employee. As of 2005, he was a Six Sigma Black Belt. He testified that Ligon had "pressured" him to "confess" that the 6.0L engine was "crap" and could not be fixed.[4]

### E. *Brien Fulton, Ford's Percipient Witness*.

Brien Fulton worked for Ford as a Diesel Powertrain Systems Technical Specialist. He had worked on the development of the 6.0L engine. He had also reviewed warranty data in an effort to identify and remedy problems with it. He was a member of the Diesel Pride III Committee, which Ford had formed to fix common problems with the 6.0L engine.

### 1. *Testimony about the 6.0L engine*.

Starting with a previous Ford diesel engine, the 6.0L engine added a new fuel system, an EGR system, and a new turbo system. It was designed to last 250,000 miles.

Ford tested the 6.0L engine before launch. When it was launched, in November 2002, it was "green," meaning that all of the issues found in testing had been resolved.

---

[4] Ligon testified that he did not know who Eeley was and did not remember this conversation.

Fulton admitted that after the launch, the 6.0L engine had problems with coking and sticking of EGR valves. "[C]oking up of the EGR system was a significant issue . . . ." Coking of the turbochargers was also "a significant issue." Fuel injectors sometimes stuck or failed. There were "rough idle concerns in some . . . engines."

However, Ford fixed all of these problems. Fulton personally fixed the turbocharger coking by causing the turbocharger, on startup, to "sweep" the vanes "full range"; this would "clear the coking." Ford generally tries to fix issues that are leading to warranty claims — to reduce costs, but mainly to improve customer satisfaction.

Excessive cylinder pressure would not cause coking; in fact, by increasing heat, it would burn more hydrocarbons and thus reduce coking.

2. *Testimony About the Emails*.

Fulton testified that Exhibit 39 was written prelaunch. The out-of-spec injectors that it referred to were never actually installed in vehicles.

Regarding Exhibit 52, which listed major issues with the 6.0L engine, Fulton testified that the numbers represented total vehicles produced while a known issue existed; they did not represent vehicles actually affected.

Exhibit 56 said that 100 percent of EBP sensors would have a corrosion problem. However, that was "a statistical projection that turned out to be wrong." The 06E17 recall fixed the corrosion problem.

21

Regarding Exhibit 62, Freeland's presentation, Fulton testified that Freeland was not an engineer. Fulton had tested Freeland's theory by intentionally raising a truck's cylinder pressure; he found no leaks.

Exhibit 63 (by Koszewnik) and Exhibit 64 (by Samardzich) both referred to an "industry standard" actuation pressure for EGR valves. Fulton denied that there was any such industry standard. He also noted that Samardzich's supposed "industry standard" of 45 pounds (i.e., 99 newtons) was different from Koszewnik's of 200 newtons.

Exhibit 65 mentioned the 6.0L engine exceeding cylinder specifications. Fulton explained that it had exceeded cylinder specifications only "at very cold operating temperatures for a very short period of time" — at temperatures under five degrees Fahrenheit, if the vehicle was accelerated before it warmed up. Ford had fixed the problem.

In response to Exhibit 189, which said that replacing all eight fuel injectors was not "satisfactory," Fulton testified that Ford never told dealers not to replace all eight fuel injectors.

F.     *Eric Kalis, Ford's Expert.*

Ford called Eric Kalis as its automotive expert. Kalis worked for Ford as a Technical Leader in the Design Analysis Group.

In his opinion, the Nolans' truck's "mechanical issues" did not "impair[] the safety of the vehicle at all." He did not believe the Nolans' assertion that in October 2004, the truck had had a total failure of the power steering and the power brakes. According to the

22

repair paperwork, they had reported only a power steering fluid leak. Although the brake booster was replaced, that was done to fix the leak. If the brakes had failed, an indicator light would have come on, and the technician would have mentioned a brake issue in the paperwork.

Moreover, at her deposition, Ms. Nolan had said that in October 2004, she took the truck in for a power steering fluid leak. The only drivability problem to which she testified was that the steering got "a little bit tighter." She also admitted that she had not felt unsafe. Kalis also did not believe (apparently because it was not in Ms. Nolan's deposition) that the truck had ever lost power in an intersection.

In May 2009, when the alternator and battery went out on a trip to Lake Havasu, the Nolans were "stranded," but they were not unsafe.

Kalis also did not accept that the turbocharger was coked. In August 2007, it was replaced because it was rusted, not because it was coked. He found no evidence of a fuel injector sticking. He pointed out that, except for the glow plugs, no component of the truck that was fixed had ever failed again.

Kalis was also a certified auto appraiser. In his opinion, the Nolans' truck was worth $6,000 to $8,000. He believed it was fixable.

II

STATEMENT OF THE CASE

The Nolans filed this action against Ford in 2013. By the time of trial, they were asserting causes of action for violation of the CLRA, violation of the Song-Beverly Act,

23

and common-law fraud on three theories — intentional misrepresentation, fraudulent concealment, and promissory fraud.

After a seven-week jury trial, the jury returned a special verdict in favor of the Nolans and against Ford on all issues. On the Song-Beverly claim, it awarded $59,634.91 in compensatory damages and $59,634.91 as a statutory penalty. On the CLRA claim, it once again awarded $59,634.91. On each of the three fraud claims, it awarded $6,115.11. Finally, on the CLRA and fraud claims, it awarded $8.125 million in punitive damages.

The Nolans acknowledged that the compensatory damages on the CLRA claim overlapped the compensatory damages on the fraud claims. They elected to recover compensatory damages under the CLRA. The trial court entered judgment accordingly.

Ford filed a motion for judgment notwithstanding the verdict, arguing, among other things:

(1) The Nolans could not recover both a statutory penalty under the Song-Beverly Act and punitive damages.

(2) The award of punitive damages was unconstitutionally excessive.

The trial court reduced the punitive damages award to $1,000,000. Otherwise it denied the motion. It entered an amended judgment.

At the same time, Ford also filed a motion for new trial. It argued, among other things:

(1)  The jury's damages awards on the CLRA and fraud causes of action were fatally inconsistent.

(2)  The court erred by admitting hearsay.

(3)  The court erred by allowing an expert witness to testify about an "industry standard" amount of punitive damages.

(4)  The compensatory damages award on the CLRA cause of action was not supported by the evidence.

(5)  The punitive damages award was unconstitutionally excessive.

The trial court denied the motion.

On motion, the trial court awarded the Nolans $688,000 in attorney fees.

III

THE INTERNAL FORD DOCUMENTS AS HEARSAY

Ford contends that the trial court erred by admitting internal Ford emails and other internal Ford documents, because they were inadmissible hearsay.  Specifically, the documents that Ford contends were erroneously admitted were Exhibits 39, 43, 47, 52, 56, 61, 62, 63, 64, 65, and 189 (documents).

A.       *Additional Factual and Procedural Background*.

In their trial brief, the Nolans argued, among other things, that certain exhibits (including all but one of those at issue on appeal) either were not hearsay, because they were not offered for their truth  or were admissible under the exceptions for statements by

25

a party-opponent, authorized admissions, declarations against interest, and/or business records.

During trial, Ford objected to all of the documents under Evidence Code section 352. The trial court directed counsel to discuss them one by one.

Exhibit 39 was an email chain from Freese. Ford objected to it as "an inadmissible business record." The trial court admitted it "because the Court feels it is a business record."

Exhibit 43 was a list of "[q]uality [c]oncerns" regarding the 6.0L engine, with no author indicated. Ford objected to it on grounds including lack of authentication as a business record. The trial court admitted it because "[i]t's a legitimate Ford document."

Exhibit 47 was an email chain from Ligon. Ford objected to it as irrelevant. The trial court admitted it, saying, "I think it's relevant."

Exhibit 52 was a draft of a presentation by the "Diesel Pride III Steering Committee" about "ongoing quality concerns." Ford objected, "[W]e don't accept this as a business record." The trial court admitted it without stating a reason.

Exhibit 56 was an email chain from Koszewnik. Ford objected to it, apparently as irrelevant and or under Evidence Code section 352. The trial court admitted it, explaining, "I don't see the prejudice."

Exhibit 61 was an email chain, again from Koszewnik. Ford objected to it as irrelevant and/or under Evidence Code section 352. The trial court admitted it without stating a reason.

Exhibit 62 was a presentation by Freeland on the reasons for a high rate of warranty claims. Ford objected to it as irrelevant and/or under Evidence Code section 352. The trial court admitted it, apparently as a business record.

Exhibit 63 was a presentation by Samardzich listing "issues" with the 6.0L engine. Ford objected to it as irrelevant and/or under Evidence Code section 352. The trial court excluded it, but ruled that it could be used for impeachment.

Exhibit 64 was an email chain from Koszewnik. Ford objected to it on multiple grounds, including "double hearsay." The trial court sustained a hearsay objection to one sentence but admitted the rest of the exhibit without stating a reason.

Exhibit 65 was an email chain from Frommann. Ford objected to it on the ground that Frommann was not "high enough to make an admission" that would be binding on Ford. The trial court admitted it, saying, "You can bring somebody in here to explain the context, but I think they're allowed to present it."

Exhibit 189 was an email chain from Ligon. Ford objected to it on the ground that it was dated after the sale to the Nolans. The trial court admitted it as "probative."

These exhibits (except for Exhibit 63) were published to the jury during Lepper's testimony. Exhibit 63 was admitted to impeach Fulton.

B. *Discussion.*

Hearsay is "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code,

27

§ 1200.)  Hearsay is inadmissible, unless it comes under a statutory exception.  (E.g.,

Evid. Code, §§ 1220-1390.)

"We review the trial court's determination as to the admissibility of evidence,

including the application of exceptions to the hearsay rule, for an abuse of discretion.

[Citations.]  Under this standard, the trial court's ruling will not be disturbed, and reversal

of the judgment is not required, unless the trial court exercised its discretion in an

arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of

justice.  [Citation.]" (*Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154,

168.)

> 1. *Forfeiture*.

Ford argues that the emails were inadmissible hearsay.  It objected to Exhibits 39,

43, 52, 64 and 65 on this ground.  However, it did not object to Exhibits 47, 56, 61, 62,

63, or 189 as hearsay.  Ordinarily, this would mean that it forfeited its present contention

with respect to the latter exhibits.  (Evid. Code, § 353, subd. (a).)

"[F]ailure to raise an issue at trial," however, "is generally excused where an

objection would have been futile . . . .  [Citation.]" (*Conservatorship of K.W.* (2017) 13

Cal.App.5th 1274, 1283.)  An objection is futile when the trial court has already

overruled objections on the same ground to similar evidence.  (*People v. Guerra* (2006)

37 Cal.4th 1067, 1126, disapproved on other grounds in *People v. Rundle* (2008) 43

Cal.4th 76, 151.)  Here, the trial court overruled Ford's first two hearsay objections.

After that, Ford did not have to raise the objection again for it to be preserved for appeal.

2.      *Authorized admissions.*

    a.      *General principles.*

There is a hearsay exception for a statement by the opposing party:  "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ."  (Evid. Code, § 1220.)  A corporation, however, can speak only through its officers and agents.  Accordingly, statements assertedly made by a corporation are not usually analyzed as party admissions under Evidence Code section 1220, but rather as authorized admissions under Evidence Code section 1222.

Under Evidence Code section 1222, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:  [¶]  (a)  The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement . . . ."  (Evid. Code, § 1222, subd (a).)

Different jurisdictions have adopted two different versions of an authorized admission exception.  In the older, narrower, now-minority version, it must be shown that the agent's authority included the authority to speak for the principal — that the agent was "a so-called 'speaking agent.'"  (2 McCormick on Evid. (8th ed.) § 259; accord, 4 Jones on Evidence (Dec. 2020 update) § 27.18; e.g., Fed. Rules of Evid., rule 804(d)(2)(C).)  In the newer, "expansive," now-majority version, it need only be shown that the agent's statement "concerned a matter within the scope of the declarant's employment and was made before that relationship was terminated."  (2 McCormick on

29

Evid. (8th ed.) § 259; accord, 4 Jones on Evidence (Dec. 2020 update) § 27.18; e.g., Fed. Rules of Evid., rule 804(d)(2)(D).)

From the wording of Evidence Code section 1222, it might appear to adopt the narrow version: The agent must be "authorized . . . to make a statement . . . for [the principal] concerning the subject matter . . . ." Our Supreme Court, however, has indicated that the scope of this exception is actually closer to the expansive version. In *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, it said: "The rule is that '"'whatever is said by an agent, either in the making of a contract for his principal, or at the time, and accompanying the *performance of any act, within the scope of his authority*, . . . of the particular contract or transaction in which he is then engaged, is, in legal effect, said by his principal, and admissible as evidence . . . . But declarations or admissions by an agent, of his own authority, and not accompanying the making of a contract, or the doing of an act, in behalf of his principal, . . . are not binding upon his principal . . . and are not admissible . . .'" [Citation.]' [Citation.]" (Ellipses in original.) (*Id.* at p. 1077.)

One court has stated (in dictum), that the adoptive admission exception "has been interpreted in California as only applying to high-ranking organizational agents who have actual authority to speak on behalf of the organization. [Citation.]" (*Snider v. Superior Court* (2003) 113 Cal.App.4th 1187, 1203.) It would be more accurate to say that, *when based on job title alone*, it applies only to high-ranking organizational agents. (E.g., *Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909, 927 ["We have no difficulty

concluding the Chief of Police was authorized to make statements on behalf of the City concerning the conduct of police officers under his command"]; *Greenspan v. LADT, LLC* (2010) 191 Cal.App.4th 486, 524 ["because Shy was the manager of [two companies], his statements were admissible as to them under the exceptions for party or authorized admissions."]; cf. *O'Neill v. Novartis Consumer Health, Inc.* (2007) 147 Cal.App.4th 1388, 1402-1403 [declarant's job title, Director of Regulatory Affairs, did not show he had authority to admit product had not been determined to be safe].) However, when based on evidence of the declarant's duties and responsibilities, it can apply to lower-ranking agents. (E.g., *Consolidated Management Group, LLC v. Department of Corporations* (2008) 162 Cal.App.4th 598, 604, 614 [salesman was authorized to send out promotional materials]; *W.T. Grant Co. v. Superior Court* (1972) 23 Cal.App.3d 284, 286-287 [manager of one store in multistore chain was authorized to make statement to subordinate about company policy]; see also *Crawford v. Sacramento County* (1966) 239 Cal.App.2d 791, 799-801 [declarant "was neither high in the hospital's hierarchy and therefore its spokesman to make admissions, nor did the alleged admission concern a matter within the scope of his agency", italics omitted].)

"In general, . . . the determination requires an examination of the nature of the employee's usual and customary authority, the nature of the statement in relation to that authority, and the particular relevance or purpose of the statement." (*O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 570 (*O'Mary*).)

31

A statement is "admissible as an authorized admission . . . only . . . where a proper foundation has been laid as to the declarant's authorization to speak on behalf of the party against whom the statement is offered. [Citations.]" (*Rochlis v. Walt Disney Co.* (1993) 19 Cal.App.4th 201, 217, disapproved on other grounds in *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251.) The proponent of the evidence must introduce "evidence sufficient to sustain a finding of such authority . . . ." (Evid. Code, § 1222, subd. (b).)

"The declarations of an [alleged] agent are not admissible to prove the fact of his agency or the extent of his power as such agent. [Citations.]" (*Howell v. Courtesy Chevrolet, Inc.* (1971) 16 Cal.App.3d 391, 401.) Here, then, hearsay statements in the documents themselves cannot be used to prove that they were authorized admissions. For example, the fact that Koszewnik's email signature described him as "Director, North American Diesel" cannot be used to prove that he actually was Ford's Director of North American Diesel.

      b.    *Application to the documents here*.

      i. *Documents admissible as authorized admissions*.

Ligon was Director of Ford's Customer Service Division. Generally, a director at Ford is in the "E-band," which means he or she is an executive — "pretty high up." Ligon was "pretty much the highest . . . for service engineering." His "primary responsibility" was to manage car and truck service engineering and recall administration. He also worked with product development, concern identification, and

technical support operations.  "[A] great portion of [his] job" was "to assist the technicians" at the dealerships.

In Exhibit 47, Ligon discussed "concerns" about the 6.0L engine and Ford's lack of a "definitive repair action."  In Exhibit 61, he discussed whether and to what extent dealers should replace fuel injectors.  In Exhibit 189, he discussed whether dealers should replace fuel injectors to avert buybacks and added, "[T]here are no fixes on certain symptoms."  As he was in upper management in general, and tasked with assisting technicians at dealerships in particular, all three emails were well within the very broad scope of his employment.

Frommann was the Warranty Program Supervisor for purchased powertrains. He was in charge of issuing TSBs.  He also supervised Ford's technical hotline.  Inferably, it was within the scope of his employment to tell other Ford employees, as he did in Exhibit 65, that the 6.0L engine had exceeded Ford's own cylinder pressure specifications, but that this information should not be published.

Koszewnik was the Director of North American Diesel.  Thus, he was "the boss. The very top of . . . Ford diesel operations."  And once again, any director at Ford is generally an executive, in the "E-band."  This showed that it was within the very broad scope of his employment to discuss problems with the 6.0L engine and warranty repairs to it, as he did in Exhibits 56, 61, and 64.

Samardzich was the Vice President of Product Development.  Although there was no evidence as to her job duties, we do know that she outranked Koszewnik, who

reported to her. This gave her ample authority to prepare Exhibit 63, listing "the top 6.0 issues."

Freeland was "an engineer over research advance," whatever that may mean. Even more confusingly, "[h]e was not an engineer." However, he testified that he gave a PowerPoint presentation (inferably Exhibit 62) to Koszewnik and others. As Koszewnik was a high-ranking director, it was inferable from the fact that he sat through the presentation that it was within the scope of Freeland's authority to give it.

In sum, then, we conclude that Exhibits 47, 56, 61, 62, 63, 64 (at least as to Koszewnik's statements), 65, and 189 were admissible as authorized admissions.

### ii. *Documents not admissible as authorized admissions*.

By contrast, all we know about Freese is his title — Chief Diesel Engineering Manager. Such a job title alone proves little. In some companies, there is only one vice-president, and he or she can speak for the company, but in others, every salesman is a vice-president. (See *O'Mary*, *supra*, 59 Cal.App.4th at p. 572 ["we do not go so far as to say that the mere fact the declarant Craft was a vice president automatically conferred on him authority to make admissions on behalf of the company."].) There was no evidence of Freese's "usual and customary authority [or] the nature of the statement in relation to that authority . . . ." (*Id*. at p. 570.) Thus, there was no evidence that it was within the scope of his authority to send Exhibits 39 and 41. There was also no evidence that it was within the scope of his authority to make the second-level hearsay statements about EGR valves that are set forth in Exhibit 64.

Exhibit 52 was authored by the "Diesel Pride III Steering Committee." Although it listed the purpose of the committee, statements in the document itself could not be used to show the scope of the committee's authority. The only extrinsic evidence of the committee's duties was that one member of it "review[ed] peak fire-pressure data." Thus, there was no evidence that it was within the scope of the committee's authority to list "major events/issues" relating to the 6.0L engine.

Last but not least, Exhibit 43 had no known author whatsoever. We may assume, without deciding, that it was adequately authenticated as a document maintained by Ford. Even if so, however, that falls short of showing that its unknown author created it while acting within the scope of his or her authority. Indeed, it falls short of showing that it was created by a Ford employee at all.

The Nolans assert that "the matters in these emails were within the course and scope of the duties of employment of each of these Ford employees . . . ." Similarly, they assert that "[t]he statements about engine problems . . . were made by the engineers and high-ranking supervisors and executives tasked with dealing with the very issues they were specifically discussing." "[T]here is no dispute that they were communicating on topics that they were tasked to communicate about." However, they do not cite any supporting evidence in the record. (Cal. Rules of Court, rule 8.204(a)(1)(C).) "We disregard those assertions that lack record citations. [Citations.]" (*Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 683, fn. 1.)

In discussing a somewhat different issue, the Nolans further assert that "part of these author-employees' jobs as Ford engineers, directors and managers was to obtain knowledge of the facts arising in their respective departments and give instructions based thereon." This time, they cite evidence — but only the documents themselves. Once again, an agent's authority cannot be proved by the statements of the agent. The Nolans point to no extrinsic evidence of the nature of employees' jobs.

In sum, then, we conclude that Exhibits 39, 41, 43, 52, and 64 (solely as to Freese's statements) were not admissible as authorized admissions.

These exhibits were admissible, however, as nonhearsay evidence that the Ford employees who received them had knowledge of the problems that they discussed. (See *People v. Thornton* (2007) 41 Cal.4th 391, 446-447.) They were also admissible under the state of mind exception to show that the authors (at least when shown to be Ford employees) had knowledge of these same problems. (Evid. Code, § 1250, subd. (a).) This knowledge had to be imputed to Ford; thus, it supported the Nolans' fraudulent nondisclosure claim. (See *Roche v. Hyde* (2020) 51 Cal.App.5th 757, 797-803 [principal could be liable for nondisclosure of information known to his agent].)

Assuming these documents were not admissible under another hearsay exception, they could not be used to show that the problems they described actually existed. (Evid. Code, §§ 1200, 1250, subd. (b).) However, there was ample other evidence of that, including those documents that were admissible, other emails that were admitted without objection, and Ford employee depositions. (See part IV, *post.*)

There was also Lepper's expert opinion testimony. It was largely uncontradicted and unimpeached. Ford called Kalis as its own expert, but he did not respond to Lepper's testimony about what was wrong with the 6.0L engine; he testified only about what was (or was not) wrong with the Nolans' truck.

Lepper also testified that he had already formed his opinion that the air management system was defective before he saw any documents produced by Ford. Thereafter, he reviewed some 8 to 12 million Ford documents. Taken as a whole, they confirmed his opinions; none of them contradicted it. Thus, although he did testify that the exhibits at issue supported his opinion, his opinion was not primarily based on them. If they had been excluded, he could and would have given the same opinions.

Brien Fulton, a Ford employee, admitted that some of the engines had post-launch problems with fuel injectors sticking, with turbocharger coking, and with EGR valve coking. He added that Ford eventually fixed these problems, but he did not specify when.

Anthony Micale, a former Ford employee, testified that the 6.0L engine's "horsepower and torque figures were not as advertised . . . [.]" Horsepower and torque were reduced by the air management system — "the coking that happens to the EGR valves and the subsequent contamination of the intake system and contamination of the turbo. . . . You lose power. You have stalls and surges . . . ."

Accordingly, even if it was error to admit Exhibits 39, 41, 43, 52 and Freese's statements in Exhibit 64 as evidence of their truth, without any limiting instruction, the error was harmless.

## IV

## THE DEPOSITIONS OF FORD EMPLOYEES AS HEARSAY

Ford contends that the trial court erred by admitting the depositions of Ford employees, taken in a former action, because they were inadmissible hearsay.

A.      *Additional Factual and Procedural Background.*

Ford filed a motion in limine to exclude certain depositions of Ford employees, including those of Eeley, Freeland, Frommann, and Ligon.

The depositions had been taken in 2011 and 2012, in a federal case entitled *In re Navistar Diesel Engine Products Liability Litigation* (*Navistar*).  *Navistar* was a class action against Ford in federal court in Illinois, asserting that the 6.0L engine was defective.  The Nolans had been members of the putative class.

When the depositions were taken, Eeley  and Frommann were current Ford employees; Freeland  and Ligon were retired Ford employees.

Ford argued that the depositions were hearsay and not within the former testimony exception (Evid. Code, §§ 1290 et seq.) because "Ford did not have a similar interest or motive to examine its employees and former employees at those depositions as it will have at the upcoming trial of this case."

In opposition, the Nolans argued:  (1) the depositions came within the former testimony exception because Ford did have the same interest and motive to cross-examine; (2) the depositions were admissible under Code of Civil Procedure section 2025.620, subdivision (g), which provides that a deposition can be used at trial in a

subsequent action involving the same subject matter and the same parties; and (3) the depositions were admissible as authorized admissions (Evid. Code, § 1222).

The trial court declined to grant the motion in limine on a blanket basis; rather, it denied the motion "without prejudice to [Ford] bringing an objection to each individual witness . . . ."

Apparently the Nolans filed additional briefing on the issue, which has not been provided to us.

We have not found any further objection by Ford. We also have not found any further ruling by the trial court.

Accordingly, portions of the Eeley, Freeland, Frommann, and Ligon depositions were played for the jury.

B.      *Forfeiture*.

The trial court's denial of the motion in limine, *without prejudice*, was not an abuse of discretion. Ford does not argue that it was. The trial court was entitled to insist on ruling on the objections on a witness-by-witness basis. For example, the motion in limine also objected to the deposition of Kalis, which Ford does not now claim was inadmissible.

In addition, the denial of a motion without prejudice is not prejudicial — almost by definition. The trial court expressly allowed Ford to object again later.

As far as we can tell, Ford never did. Of course, it is possible that in a 17-volume reporter's transcript, we have missed something. For precisely that reason, however,

39

Ford has the burden to show, with appropriate citations to the record, that it preserved the claimed error for appeal. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407; e.g., *Mirabito v. Liccardo* (1992) 4 Cal.App.4th 41, 47.) It cites only its motion in limine; it also says, "The court overruled Ford's objection," unsupported by any further citation.

Because Ford did not object again (or, at least, has not shown us that it did object again), it has forfeited any contention that the admission of the depositions was erroneous. (Evid. Code, § 353, subd. (a).)

V

EXPERT TESTIMONY TO AN "INDUSTRY STANDARD"

GERMANE TO PUNITIVE DAMAGES

Ford contends that the trial court erred by permitting an expert witness to testify about an "industry standard" punitive damages award.

A.    *Additional Factual and Procedural Background*.

Dr. Barbara Luna was the Nolans' expert forensic accountant. Ford filed a motion in limine to bar her from testifying on three topics: "(1) her conclusions that Ford committed fraud, (2) her beliefs about the legal standards that govern the award of punitive damages, and (3) her estimation of the proper amount of a punitive damages award . . . ." Ford argued that such testimony "would exceed the proper bounds of expert testimony, usurp the role of the jury . . . and of the court . . . , and would be impermissibly speculative, conclusory, and lacking in foundation."

40

The trial court noted that, in a previous trial, Dr. Luna had "only talked about the financial condition of Ford . . . ." It ruled that, once again, it "would allow her to discuss the financial condition of Ford"; however, it granted the motion as to testimony about fraud.

Ford's counsel agreed, "She can talk about Ford's financial condition . . . ."

On direct, Dr. Luna testified:

"Q. . . . And, Dr. Luna, you've been involved in assessing punitive damages for both defense and plaintiffs . . . — what is the industry's standard as to what a company can absorb and still conduct business operations? What percentage?

"A. Less or equal to ten percent of the net worth."

She testified that Ford's net worth was $36.469 billion; ten percent of this would be roughly $3.65 billion, and one percent would be roughly $365 million.

Finally, she testified that compensatory damages of $67,738 would be 0.0002 percent of Ford's net worth. Ten times that would be $677,380. $677,380 would be the same proportion of Ford's net worth as $0.80 would be to a person with a net worth of $50,000.

Counsel for Ford did not raise any of Ford's present objections. Rather, they cross-examined Dr. Luna as follows:

"Q. . . . Tell me if this is right. I think you're saying that any company on the planet can lose 10 percent of its net worth and continue doing business? [¶] . . . [¶] . . .

41

"A. Punitive damages, that's the limitation that I've been — my understanding from reading various documents in the field as we talk. Yes, 10 percent — the limitation is 10 percent of the net worth of a company."

Dr. Luna also testified on cross-examination that forensic accountants, members of the California Society of CPAs, and accenting handbooks all agreed that punitive damages are limited to 10 percent of a company's net worth. She added, "There's a triangulation which means a multiple of the underlying damages, and also considering up to 10 percent of the net worth of the company."

B. *Discussion*.

Ford's motion in limine sought to bar Dr. Luna from testifying to the legal standards for punitive damages and to the appropriate amount of punitive damages. The trial court, however, ruled only that she could testify to Ford's financial condition. Counsel for Ford agreed to this; they did not press for a ruling on the issue actually presented in the motion for limine. This constituted a forfeiture of that issue. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 306, fn. 4.)

Ford's counsel were free to raise the issue again when Dr. Luna actually testified. However, they did not. Thus, once again, they forfeited it.

In any event, on direct, Dr. Luna did not give any testimony on the topics specified in Ford's motion in limine. She testified to Ford's net worth, and she did mathematical calculations. This did not go beyond the scope to which Ford's counsel had agreed. Her only testimony that even arguably went beyond that was that a business can lose up to ten

42

percent of its net worth and still be viable. This did not express a "belief[] about the legal standards that govern the award of punitive damages." It also was not an "estimation of the proper amount of a punitive damages award." It was about the real-world effect of a punitive damages award in a certain amount.

On cross, Dr. Luna did give some testimony about the legal standards applicable to punitive damages — that they can be up to 10 percent of a company's net worth, and that this figure must be "triangulate[d]" with "a multiple of the underlying damages." However, this was elicited by Ford's own counsel; Ford's counsel did not object to Dr. Luna's answers, as nonresponsive or otherwise. Thus, for the third and final time, they forfeited Ford's present contention.

## VI

## INCONSISTENT DAMAGES AWARDS

As mentioned, the jury awarded $59,634.91 on the Nolans' CLRA claim and $6,115.11 on each of their fraud claims. Ford contends that these amounts are inconsistent.

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.]" (*Huy Fong Foods, Inc. v. Underwood Ranches, LP* (2021) 66 Cal.App.5th 1112, 1125.)

"'[A] court may interpret the verdict "'from its language considered in connection with the pleadings, evidence and instructions,'" and counsel's argument to the jury.

[Citations.]' [Citations.]" (*Missakian v. Amusement Industry, Inc.* (2021) 69 Cal.App.5th 630, 654.)

"There is no requirement that inconsistent special verdict findings be called to the trial judge's attention to preserve the issue on appeal. [Citations.]" (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2021) ¶ 17:96 at p. 17-20, italics omitted.)

"'On appeal, we review a special verdict de novo to determine whether its findings are inconsistent.' [Citation.] 'Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law. [Citation.] The appellate court is not permitted to choose between inconsistent answers. [Citations.]' [Citations.]" (*Missakian v. Amusement Industry, Inc., supra,* 69 Cal.App.5th at p. 655.)

The jury here was instructed that the CLRA claim, like the fraud claims, required a false representation. (CACI No. 4700.)

Regarding all claims other than the Song-Beverly claim, it was instructed that actual damages comprised two separate elements:

(1) "To decide the amount of damages, you must determine the fair market value of what [the Nolans] gave[] and subtract from . . . that amount the fair market value of what they received." (CACI No. 1923.)

44

(2)  "Plaintiffs can also recover amounts that they reasonably spent in reliance on Ford Motor Company's false representation and/or failure to disclose and/or false promise if those amounts would not otherwise have been spent."  (CACI No. 1923.)

In closing argument, counsel for the Nolans argued that the jury should award the purchase price of $56,899.80 plus repair costs — which he called "out-of-pocket incidentals" — of $6,115.11, for a total of $63,014.91.

Regarding damages, the special verdict form for the CRLA claim asked:  "What are Jerry and Shawn Nolan's *actual damages*?"  (Italics added.)  The jury answered, "$59,634.91."  By contrast, the special verdict forms for the fraud claims asked, "What are Jerry and Shawn Nolan's *out of pocket damages*?"  (Italics added.)  The jury answered, "$6,115.11."

It seems clear that the jury gave different answers because the two sets of special verdict forms asked different questions.  The jury was correctly instructed that the measure of damages for the CLRA claim and the fraud claims was the same.  The CLRA special verdict form asked what the Nolans' "actual damages" were, and the jury answered that question in accordance with the instructions and its view of the evidence. The fraud claim form, however, asked what the Nolans' "out of pocket damages" were. The jury had not been given any instruction defining "out of pocket damages." Therefore, it could reasonably assume that this referred to the second element of damages specified in the instruction (amounts spent in reliance), but not the first (fair market value minus use).  The jury could also reasonably rely on the Nolans' counsel's description of

45

the $6,115.11 as the "out-of-pocket" damages.  Finally, from the very fact that the two sets of special verdict forms used different wording, the jury could reasonably conclude that the difference was significant and meaningful.

In sum, the special verdict forms simply never asked the jury what the Nolans' "actual damages" on the fraud claims were.  Had the forms done so, presumably the jury would have awarded $59,634.91 on those claims, too.

Ford argues that legally, "'actual damages' and 'out-of-pocket' damages are the same."  Maybe so, but the jury here was never told that.  Ford points out that the Nolans' counsel also told the jury that to calculate "actual damages" on the fraud claims, they should use "the out-of-pocket rule, [CACI No.] 1923.  There's a lot of parts to it."  This did not clearly state whether "the out-of-pocket rule" meant just one or both "parts" of the instruction.

Ford also cites the presumption that the jurors understand and follow the instructions.  Here, however, they followed them in a reasonable manner when answering a question that used a term that had not been defined in the instructions.  We do not think that is the same as not following the instructions; but if it is, then the very fact that the jury awarded damages in two different amounts rebuts the presumption.

VII

EVIDENCE SUPPORTING THE DAMAGES AWARD ON THE CLRA CLAIM

Ford contends that the amount of the jury's award of damages on the CLRA claim is not supported by the evidence.

The jury awarded the exact same amount on the CLRA claim as on the Song-Beverly claim — $59,634.91.  However, the correct way to calculate the damages on these claims was different.

On the Song-Beverly claim, the Nolans were entitled to "the purchase price paid . . . , less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity."  (Civ. Code, § 1793.2, subd. (d)(1).)  Under the prescribed statutory formula, the useful life of a vehicle is assumed to be 120,000 miles; thus, the value of the use prior to discovery of the nonconformity is calculated as:

$$\text{purchase price} \times (\text{miles driven before discovery} / 120{,}000)$$

(Civ. Code, § 1793.2, subd. (d)(2)(C).)

In addition, the Nolans were entitled to the cost of repairs to make the truck conform.  (Civ. Code, § 1794, subd. (b)(2).)

The jury was so instructed.  (CACI Nos. 3241, 3242.)  Moreover, the special verdict form walked it through this calculation.

The jury found:

Total amount paid:                 $56,899.80

Incidental out-of-pocket damages   $6,115.11

Miles driven before discovery:        8,109[5]

---

[5]      The first time the Nolans brought the truck in for service, it had 8,204 miles on it.  However, it already had 95 miles on it when they bought it.

47

Value of use before discovery:    $3,380[6]

Accordingly, its total award on the Song-Beverly claim was:

$56,899.80 - $3,380 + $6,115.11 = $59,634.91

On the CLRA claim, the Nolans were "entitled to recover the difference between the actual value of that with which [they] parted and the actual value of that which [they] received, together with any additional damage arising from the particular transaction . . . ." (Civ. Code, § 3343, subd. (a).)

Once again, the jury was so instructed. (CACI No. 1923.) The special verdict form, however, did not lay out all the steps of this calculation; it had just one line for the Nolans' "actual damages."

The jury's total award on the CLRA claim was, again, $59,634.91. The only way it could have arrived at this figure, consistently with the instructions, was if the actual value of the truck at the time of purchase was $3,380.

Ford therefore argues that there was no substantial evidence that this was the actual value of the truck at purchase. The jury found that this was the value of the Nolans' use of the truck in October 2004, after 8,109 miles of use (i.e., 8,204 miles on the odometer; see fn. 5, *ante*); however, the Nolans continued to use the truck until May 2015, when it had 129,855 miles on it.

---

[6]    As the purchase price, the jury used $50,030.53, which was the price before accessories, fees, and sales tax:

$$\$50,030.53 \times (8,109/120,000) = \$3,380.81$$

48

"[T]he fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." (*California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 487.) "' . . . [W]hen it clearly appears that a party has suffered damage a liberal rule should be applied in allowing a court or jury to determine the amount, and . . . , given proof of damage, uncertainty as to the exact amount is no reason for denying all recovery." (*Id*. at pp. 486-487.)

"[F]air market value is the price that "'a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts.'" [Citation.]" (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1274.) The jury was so instructed. It could reason that a truck that ran as expected for 8,109 miles was worth 8,109/120,000 of the price of a truck that would run as expected for 120,000 miles. Moreover, it could reason that a buyer knowing all the pertinent facts — i.e., that the truck would break down repeatedly and unpredictably after 8,109 miles — would not pay a penny more for any usage it happened to get beyond that. The fact that it could be used for some additional time was zeroed out by the fact that it would cause expense, anxiety, and risk throughout that time. The Nolans should not be penalized just because, once they found themselves in this situation, they made the best of a bad job by continuing to drive the truck.

This reasoning was supported by Lepper's testimony that the truck was "completely unsalable."[7] Ms. Nolan similarly testified that the truck was unsalable and had a negative value. In California, "[t]he opinion of an owner of personal property is in itself competent evidence of the value of that property, and sufficient to support a judgment based on that value. [Citations.]" (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921.) Ford argues that Ms. Nolan testified to a "subjective" valuation, rather than an "objective market value." It was phrased, however, as an objective market value — "unsalable." To assume all owner valuation opinions are "subjective" would abrogate the well-established owner-opinion rule. Admittedly, both witnesses' testimony referred to value at the time of trial, but the jury could reasonably project it back to when the truck first started causing problems.

Ford points to the fact that, at her deposition, Ms. Nolan estimated that the truck was worth $8,000. Moreover, at trial, Kalis estimated that it was worth $6,000 to $8,000. The jury, however, did not have to accept either opinion. (See *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633 ["So long as it does not do so arbitrarily, a jury may entirely reject the testimony of a[n] expert, even where . . . the expert testimony is not contradicted."].)

Ford argues: "If the Nolans did not have their truck they would have had to purchase, lease, or rent another vehicle to cover these transportation needs — something which would undoubtedly have cost them tens of thousands of dollars. [Citations.]" This

---

**7** Ford claims that "Lepper gave no such testimony . . . ." But he did.

50

overlooks the fact that, in exchange for the cost of a replacement vehicle, the Nolans would have received reliable transportation that was worth the cost. Instead, they saved that cost but incurred what the jury found to be an equivalent amount of inconvenience and expense.

Ford quotes the recherché case of *Spring Valley Water Co. v. City & County of San Francisco* (N.D. Cal. 1908) 165 F. 667 as saying, "[C]ost of a substitute system may be considered in finding the reasonable value." Ford's period after "value" is misleading. That case actually said, "While the cost of a substitute system may be considered in finding the reasonable value . . . , *it cannot be a controlling element*." (*Id.* at p. 691, italics added.) It added, "Even if permissible, a valuation . . . based on the estimated cost of the next available substitutional system is at best problematical. . . . We must reckon . . . with the relative serviceability and permanency of the substitute system . . . ." (*Ibid.*) That is the problem with Ford's analysis here — a substitute vehicle would have been both more serviceable and more permanent.

We therefore conclude that the jury's award of damages on the CLRA claim was supported by substantial evidence.

VIII

RECOVERY OF BOTH A STATUTORY PENALTY AND PUNITIVE DAMAGES

Ford contends that the Nolans cannot recover both a statutory penalty under the Song-Beverly Act and punitive damages on their CLRA and fraud claims.

The jury awarded the same amount of punitive damages on the CLRA claim and on each of the three fraud claims. The Nolans elected to recover *compensatory* damages on the CLRA claim, rather than on the fraud claim; thus, the *punitive* damages award may be regarded as being solely on the CLRA claim. As long as the award of punitive damages on the CLRA claim does not overlap the statutory penalty under the Song-Beverly Act, it may be upheld, even assuming an award of punitive damages on one of the fraud claims *would have been* overlapping.[8] We therefore limit our consideration to the Song-Beverly and CLRA claims.

The Song-Beverly Act provides that, for a willful violation, in addition to actual damages, a buyer may recover "a civil penalty which shall not exceed two times the amount of actual damages . . . ." (Civ. Code, § 1794, subd. (c).) It further provides: "The remedies provided by this chapter are cumulative and shall not be construed as restricting any remedy that is otherwise available . . . ." (Civ. Code, § 1790.4.)

The CLRA expressly permits the recovery of punitive damages in a suitable case. (Civ. Code, § 1780, subd. (a)(4).) Much like the Song-Beverly Act, it also provides: "The remedies provided herein for violation of any section of this title or for conduct proscribed by any section of this title shall be in addition to any other procedures or remedies for any violation or conduct provided for in any other law." (Civ. Code, § 1752.)

---

[8] The Nolans concede that their promissory fraud claim is based on the same conduct as their Song-Beverly claim.

"[I]f a defendant is liable for a statutory penalty . . . , the award is punitive in nature, and the award penalizes essentially the same conduct as an award of punitive damages[, t]he plaintiff cannot recover punitive damages in addition to that recovery but must elect its remedy. [Citations.] . . . We presume that the Legislature did not intend to allow such a double recovery absent a specific indication to the contrary. [Citations.]" (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 759-760.)

The source of this rule — and the rule against a double recovery in general — is not entirely clear. *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218 (*Troensegaard*) "note[d]" the statement in a lower federal court case that overlapping punitive damages awards violate due process. (*Id.* at p. 227, citing *In re Northern Dist. of California Dalkon Shield IUD Products Liability Litigation* (N.D. Cal. 1981) 526 F.Supp. 887, 899, vacated on other grounds in *Abed. v. A.H. Robins Co.* (9th Cir. 1982) 693 F.2d 847; see also *In re Federal Skywalk Cases* (8th Cir. 1982) 680 F.2d 1175, 1188 ["Unlimited multiple punishment for the same act determined in a succession of individual lawsuits and bearing no relation to the defendants' culpability or the actual injuries suffered by victims, would violate the sense of "fundamental fairness" that is essential to constitutional due process."], cert. den. sub nom. *Stober v. Rau* (1982) 459 U.S. 988.) *Troensegaard*, however, went on to say: "We are of the opinion that had the Legislature . . . intended a double recovery of punitive and penal damages for the same willful, oppressive, malicious, and oppressive acts, it would in some appropriate manner

53

have said so." (*Id.* at p. 228.) This implies that there is no absolute due process bar to a double recovery, so long as that is what the Legislature intended. (See also *Shore v. Gurnett* (2004) 122 Cal.App.4th 166, 176 [imposing criminal penalty and punitive damages for same conduct does not violate due process].)

Because the question is close, we assume, without deciding, that overlapping punitive damages awards do violate due process. On that assumption, it is irrelevant that both the Song-Beverly Act and the CLRA state that the remedies they provide are cumulative; regardless of the wording of the relevant statutes, and regardless of the legislative intent, "a statutory penalty [that] . . . penalizes essentially the same conduct as an award of punitive damages" (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles*, *supra*, 152 Cal.App.4th at pp. 759-760) is unconstitutional.

A statutory penalty under the Song-Beverly Act "is imposed as punishment or deterrence of the defendant, rather than to compensate the plaintiff," and therefore "is akin to punitive damages. [Citation.]" (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184.) The key question is whether the statutory penalty and the award of punitive damages "penalizes essentially the same conduct . . . ." (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles*, *supra*, 152 Cal.App.4th at pp. 759-760.)

First, we discuss what "the same conduct" means in this context; second, we discuss whether the two awards here were based on "the same conduct," as thus defined.

A.   *The Legal Standard for Whether Two Awards of Punitive Damages*

     *"Penalize[] Essentially the Same Conduct*."

"The same conduct," on its face, seems pretty clear.  It means the conduct giving

rise to liability for punitive damages — i.e., the conduct being penalized.  This is the

conduct that satisfies the elements of the cause of action, and that must be accompanied

by malice, oppression, or fraud.

That was the situation in *Clauson v. Superior Court* (1998) 67 Cal.App.4th 1253.

There, the plaintiffs asserted causes of action for invasion of privacy and for violation of

Penal Code section 637.2, subdivision (a), both based on the defendants' conduct of

wiretapping one plaintiff's phone and thus eavesdropping on conversations between him

and the other plaintiffs.  (*Id*. at p. 1255.)  The appellate court held that, if the plaintiffs

prevailed, they would have to elect between punitive damages on the invasion of privacy

claim or a statutory penalty under the Penal Code section.  (*Id*. at p. 1256.)

Likewise, in *Marshall v. Brown* (1983) 141 Cal.App.3d 408 (*Marshall*), the

plaintiff asserted causes of action for slander and for misrepresentation preventing

employment, in violation of Labor Code section 1050, both based on a letter the

defendants had sent.  (*Marshall*, *supra*, at pp. 411-412.)  The appellate court held that the

plaintiff would have to elect between punitive damages on the slander claim and a

statutory penalty under the Labor Code claim.  (*Id*. at p. 419.)

Ford argues that "the same conduct" means the defendant's entire "unified course

of conduct, *even if* multiple and distinct acts are involved."  It cites *In re Northern Dist.*

*of California Dalkon Shield IUD Products Liability Litigation*, *supra*, 526 F.Supp. 887

(*Dalkon*).  *Dalkon* said, "Common sense dictates that a defendant should not be subjected

to multiple civil punishment for a single act *or unified course of conduct* which causes

injury to multiple plaintiffs."  (*Id*. at p. 900, italics added.)  However, it also said, "A

defendant has a due process right to be protected against unlimited multiple punishment

for *the same act*."  (*Id*. at p. 899, italics added.)

More to the point, in *Dalkon*, there was simply no issue as to the *scope* of the bar

on overlapping punitive damages.  The court mentioned it only because, in the case

before it, it was a factor in favor of certifying a class, because that would prevent

overlapping awards.  (*Id*. at pp. 898-900.)  "It is axiomatic that cases are not authority for

propositions that are not considered.  [Citation.]"  (*California Building Industry Assn. v.

State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043.)

Ford also cites *Troensegaard*, *supra*, 175 Cal.App.3d 218.  In *Troensegaard*, the

plaintiff bought a motorhome manufactured by the defendant; the motorhome was

defective because it gave off formaldehyde fumes.  (*Id*. at pp. 223-224.)  The defendant

had an engineering company examine the motorhome, but it refused to release the

resulting report to the plaintiff.  (*Id*. at p. 224.)  She sued for products liability, fraudulent

concealment, and for violation of the Song-Beverly Act.  (*Id*. at pp. 220-221, 226.)

The appellate court upheld an award of punitive damages because "intentional

concealment from plaintiff of the high level of formaldehyde fumes found in the

mobilehome, and its failure substantially to comply with its express warranty by taking

appropriate corrective action or otherwise making Mrs. Troensegaard whole, was reasonably found by the jury to constitute 'oppression, fraud, or malice' with a 'conscious disregard of the plaintiff's rights.'" (*Troensegaard*, *supra*, 175 Cal.App.3d at p. 226.)

It also held, however, that the plaintiff could not recover both punitive damages and a statutory penalty under the Song-Beverly Act. (*Troensegaard*, *supra*, 175 Cal.App.3d at pp. 226-228.) It said, "Each of the awards was based upon substantially the same conduct of [the defendant]." (*Id*. at p. 226.)

One justice dissented, in part. As he saw it, "the punitive damages award was based not on the same conduct evidencing wilful noncompliance but on the separate and distinct theory of fraudulent concealment of the unfavorable . . . report; and the jury so specially found. That special finding, adequately supported by the evidence, independently justified an award of punitive damages under Civil Code section 3294. Each award rests on a separate factual basis and legal theory involving more than a single kind of actionable conduct entitled to be redressed in damages." (*Troensegaard*, *supra*, 175 Cal.App.3d at p. 230 [dis opn. of Racanelli, J.].)

According to Ford, *Troensegaard* means that the bar to overlapping punitive damages applies to its whole course of conduct, as shown by the evidence. It claims that, by rejecting the dissenting justice's view, the *Troensegaard* majority essentially also rejected the Nolans' position that the two awards here are based on separate and distinct conduct.

That is not how we read *Troensegaard*. In the view of the majority, the punitive

damages award was based on *both* the fraudulent concealment claim and the Song-

Beverly claim; therefore, it was based on the same conduct as the Song-Beverly statutory

penalty. In the view of the dissent, it was based *only* on the fraudulent concealment

claim, and therefore on different conduct. Without the record in *Troensegaard*, it is hard

to say who had the better of this argument. We can say, however, that both sides focused

— as we do — on the conduct that gave rise to the punitive damages.[9]

Ford also argues, alternatively, that a statutory penalty and punitive damages are

"based on the same conduct" if they arise out of the violation of a single "primary right."

It cites two cases that referred to a statutory penalty and punitive damages arising out of

"the same cause of action." (*Los Angeles County Metropolitan Transportation Authority*

---

[9]      The dissent is laconic. Its statement that the punitive damages award was
not based on the "conduct evidencing willful noncompliance" seems to mean that it was
not based on the Song-Beverly claim at all.

It is possible, however, that the dissenting justice was saying (in an awkward way)
that, as long as the punitive damages award was based on *both* the fraudulent
concealment and Song-Beverly claims, it could be deemed to be based on the former, and
hence to be based on different conduct from the latter.

If so, we would agree with the dissent, and not with the majority. If a punitive
damages award on the Song-Beverly claim had to be struck down as duplicative, a
punitive damages award on the fraudulent concealment claim could still stand.

Similarly, in this case, as already mentioned, the Nolans concede that the award of
punitive damages on the promissory fraud claim is duplicative. If it stood alone, it would
have to be struck down. However, we may sustain the award of punitive damages based
on the CLRA claim.

*v. Superior Court* (2004) 123 Cal.App.4th 261, 268 (*Los Angeles*); *Marshall v. Brown*, *supra*, 141 Cal.App.3d at p. 418.)

There are several problems with this.  First, the references in both *Los Angeles* and *Marshall* were in passing.  They were not intended to define the scope of the rule against overlapping punitive damages.  Once again, cases are not authority for propositions that are not considered.  (*California Building Industry Assn. v. State Water Resources Control Bd.*, *supra*, 4 Cal.5th at p. 1043.)

Second, "cause of action" is a notoriously slippery term.  It may refer to each count of a complaint, which states a distinct legal theory.  It may also refer to each distinct harm or injury asserted by the plaintiff.  (See generally *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798.)  When used in the latter sense, "[u]nder the 'primary rights' theory, a cause of action arises from the invasion of a primary right." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 818, fn. 1.)  The "primary rights" definition of a cause of action is significant primarily in the field of res judicata.  (*Boeken v. Philip Morris USA, Inc.*, *supra*, at p. 798.)  It is not clear in which sense *Los Angeles* and *Marshall* were using the term, but it seems most likely to have been in the pleading sense.

It would make no sense to state the rule against overlapping punitive damages in terms of the plaintiff's "primary right."  In applying the rule against overlapping *compensatory* damages, the focus is on the harm to the plaintiff.  "'The primary object of an award of damages in a civil action . . . is just compensation or indemnity for the loss or

injury sustained by complainant, *and no more*.' [Citations.]" (*Estate of De Laveaga* (1958) 50 Cal.2d 480, 488, italics added.) However, in applying the rule against overlapping *punitive* damages, the focus is on the harmful conduct of the defendant. The punitive damages should be sufficient to deter such conduct, *but no more*. If the defendant harms the plaintiff by lying about a defective truck, and if it thereafter harms the plaintiff by failing to fix the defective truck, a jury can fairly decide that double deterrence is necessary.

As contrary authority, Ford cites *Holmberg v. Morrisette* (8th Cir. 1986) 800 F.2d 205, cert. den. (1987) 481 U.S. 1028. There, the defendants wrongfully drew down a letter of credit issued by plaintiff Holmberg by submitting false and misleading documents. (*Id*. at pp. 207-208.) The plaintiff sued the defendants for, among other things, fraud and conversion. (*Id*. at p. 208.) The appellate court, applying Minnesota law (see *id*. at p. 211), said: "[A] recovery of compensatory damages on both the fraud and conversion claims clearly would be duplicative and should not be allowed. Holmberg has suffered only one injury — the wrongful drawing down of his letter of credit — and is entitled to be compensated for that injury only once. Similar reasoning applies to the question of punitive damages on both the fraud and conversion claims. Fraud and conversion are separate legal theories of liability, but in reality defendants have injured Holmberg only once. Accordingly, they are to be punished only once, not as many times as there are separate legal theories that have been found to fit the case." (*Id*. at p. 212.)

We agree with the result in *Holmberg*.  The punitive damages, whether for fraud or conversion, arose from a single act by the defendants — drawing down the letter of credit.  However, we do not agree with *Holmberg*'s focus on the injury to Holmberg rather than on the conduct of the defendants.

B.　　*The Application of the Legal Standard to This Case.*

As the jury was instructed, to be liable under the CLRA, Ford had to have either: "[one,] represented that the 2004 Ford Excursion had characteristics, uses, or benefits, which it did not have, or [two,] represented that the 2004 Ford Excursion was of a particular standard, quality, or grade, or of particular style or model, if it is another; or, three, advertised the 2004 Ford Excursion with the intent not to sell them as advertised . . . ."  (CACI No. 4700.)  These "unfair or deceptive acts and practices" had to have occurred "in a transaction that resulted, or was intended to result, in the sale or lease of goods or services to a consumer . . . ."  Moreover, the Nolans had to have "relied" on the representation.  If Ford "acted with malice, oppression, or fraud," the jury could award punitive damages.  (CACI No. 3845.)

The jury was also instructed that, to be liable under the Song-Beverly Act, Ford had to have "failed to repair the vehicle to match the written warranty after a reasonable number of opportunities to do so," and thereafter failed to "promptly replace or buy back the vehicle."  (CACI No. 3201.)  If the jury found that Ford's "failure to promptly repurchase or replace the vehicle after a reasonable number of repair opportunities . . . was willful," it could award a civil penalty.  (CACI No. 3244.)

61

In sum, then, Ford's liability under the CLRA — including its liability for punitive damages — was based on its acts prior to the sale. By contrast, its liability under the Song-Beverly Act — including its liability for a civil penalty — was based on its acts after the sale.

Thus, if Ford had misrepresented the truck prior to sale but then had either (1) repaired it to conform to the warranty, or (2) repurchased or replaced the truck, it would be liable under the CLRA, but not under the Song-Beverly Act. Conversely, if Ford had not misrepresented the truck prior to sale but then had failed to either repair or repurchase it, it would be liable under the Song-Beverly Act, but not under the CLRA.

Admittedly, both claims required a defect in the truck. For purposes of the CLRA, the defect had to exist when the truck was sold. For purposes of the Song-Beverly Act, it could exist before the truck was sold or it could develop after the sale. Most important, for both purposes, the existence of a defect was necessary but not sufficient for liability.

Ford argues that "[t]here was . . . no . . . instruction that required the jury to consider only pre-sale evidence on the CLRA . . . claim[] and only post-sale evidence on the Song-Beverly claim." This is a red herring. Post-sale *evidence* could be relevant to pre-sale *conduct* (and vice versa). For example, to show that Ford's pre-sale representations were false, the Nolans were entitled to show that Ford and/or the truck ultimately did not live up to them post-sale.

As another example, Exhibit 62, a post-sale email from Koszewnik, said that the 6.0L engine had a 15-newton EGR valve rather than a 200-newton EGR valve, which

was the "industry standard." This was relevant both to whether the 6.0L engine was defective and to whether Ford knew — even pre-sale — that it was defective.

Moreover, as already discussed, the jury instructions *did* effectively instruct the jury that the CLRA claim had to be based on pre-sale *conduct* and the Song-Beverly claim had to be based on post-sale *conduct*. The CLRA instruction stated that liability had to be based on a representation by Ford, on which the Nolans relied, and which resulted in a consumer transaction — i.e., pre-sale conduct. And the Song-Beverly instruction stated that Ford had to have failed to repair the vehicle and had to have failed to replace or buy back the vehicle — i.e., post-sale conduct.

Ford also argues that in closing argument, counsel for the Nolans relied on post-sale evidence both to prove the CLRA claim and to support the claim for punitive damages under the CLRA.

Ford cites counsel's "continuing fraud" argument — that "every time the Nolans . . . would bring their truck in, Ford would tell them it was fixed." The Nolans' counsel, however, related this specifically to the promissory fraud claim, not the CLRA claim.

Ford also cites counsel's argument that Ford made a pre-sale misrepresentation by stating that the truck came with a warranty, and that this was an implied representation "that not only would they honor the warranty, but they would fix the vehicle." Once again, however, *evidence* that Ford failed to fix the vehicle post-sale was relevant to show that its pre-sale representation was false. Even so, Ford's liability was based on the pre-sale representation, which had to be false and had to be made with pre-sale knowledge

63

that it was false. (*Wilson v. Hewlett-Packard Co.* (9th Cir. 2012) 668 F.3d 1136, 1145 ["under the CLRA, plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale"]; *Stewart v. Electrolux Home Products, Inc.* (E.D. Cal. 2018) 304 F.Supp.3d 894, 906 ["[a] representation will not violate the CLRA if the defendant did not know or have reason to know of the facts that rendered the representation misleading at the time it was made."].) The post-sale failure to fix was merely evidence of pre-sale falsity.

Next, Ford cites counsel's argument that fraud, for the purpose of punitive damages under the CLRA, was shown by post-sale emails, such as the one telling the recipient to delete it. Post-sale emails were evidence that Ford had an intent to conceal; it was inferable that this intent also existed pre-sale. In any event, to find Ford liable under the CLRA at all, the jury had to find that Ford made a knowingly false pre-sale representation. It is inconceivable that the jury found fraud for purposes of punitive damages on this claim based solely on the post-sale emails and not on the pre-sale fraud.

Finally, Ford points to counsel's argument that Ford knew its representations were false because, at the time, "they were ramping up their lawsuit to fi[le] against Navistar." Ford asserts that that lawsuit "wasn't filed until several *years* after the Nolans purchased their vehicle." However, Ford does not cite the record; as far as we can tell, all we know is that it was filed sometime before August 2007. A fortiori, there was no evidence of when Ford was "ramping up" a lawsuit against Navistar, which must have been sometime before the lawsuit was actually filed. Most important, when the Nolans' counsel made

64

this statement, he was specifically discussing the intentional misrepresentation claim, not the CLRA claim.

    C.    *Anderson*.

*Anderson v. Ford Motor Co.* (2022) 74 Cal.App.5th 946 (*Anderson*), pet. for rev. filed Mar. 21, 2022, supports our conclusions. Anderson was yet another case against Ford arising out of alleged defects in the 6.0L engine. (*Id*. at pp. 950-959.) There, as here, Ford argued that the plaintiffs could not recover both a statutory penalty under the Song-Beverly Act and punitive damages. (*Id*. at pp. 962-963.) The appellate court disagreed because "the punitive damages and statutory penalties were based on different conduct that took place at different times. The punitive damages were based on conduct underlying the fraud . . . cause[] of action and took place before the sale. The civil penalty was based on defendant's post-sale failure to comply with its Song-Beverly Act obligations to replace the vehicle or make restitution when reasonable attempts to repair had failed." (*Id*. at p. 966; see also *id*. at p. 971.)

It rejected Ford's argument that "the same conduct" should be defined in terms of the plaintiffs' primary right. (*Anderson*, *supra*, 7 Cal.App.5th at pp. 968-969.) "'The primary right theory has a fairly narrow field of application'" — namely the field of res judicata. (*Id*. at p. 969.) "'[T]he primary right must also be distinguished from the remedy sought . . . . '[M]ultiple remedies may be available to vindicate a single primary right.' [Citation.]" (*Ibid*.) Rather, "the appropriate inquiry should be focused on the underlying conduct." (*Anderson*, *supra*, at p. 965.) "[T]he recovery of both punitive

damages and civil penalties is prohibited when the underlying conduct for both remedies *is the same conduct, i.e., identical conduct.*" (*Id.* at pp. 970-971.)

Finally, it also rejected Ford's argument that the plaintiffs had relied on the same evidence to prove "a pattern and practice of misconduct" constituting both fraud and a Song-Beverly violation. (*Anderson*, *supra*, 7 Cal.App.5th at pp. 970-973.) "To be sure, the corporate communications were probative of Ford's culpability for its pre-sale conduct, the level of reprehensibility of that conduct, and the amount of punitive damages to be imposed. But the fact some of those communications may have also been probative of the willfulness of Ford's Song-Beverly Act noncompliance does not bar plaintiffs from both an award of punitive damages and civil penalties. [Citation.]" (*Id.* at p. 971.) "Ford simply cannot escape liability for both awards by virtue of the fact that it engaged in a pattern or practice of deceitful misconduct throughout the course of the discrete events and conduct involved here." (*Id.* at p. 973.)

In short, *Anderson* is dispositive of Ford's present contention. Nevertheless, because the opinion in *Anderson* is not yet final, we have analyzed the contention independently, and we have come to the same conclusions as *Anderson*.

For these reasons, we conclude that the statutory penalty and the punitive damages did not punish the same conduct.

IX

THE AMOUNT OF PUNITIVE DAMAGES

Ford contends that the punitive damages award is unconstitutionally excessive.

66

A.     *Additional Factual and Procedural Background.*

The trial court explained its decision to reduce the punitive damages award from $8.125 million to $1 million only as follows:  "The Court notes that the actual damages in this case are just under $60,000, and the penalties are just under $60,000.  So using the principle of proportionality, the Court feels that an adequate award is $1 million . . . ."

B.     *The Three "Guideposts."*

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.  [Citations.]  The reason is that '[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.'  [Citation.]  To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property.  [Citation.]"  (*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416-417.)

"[C]ourts reviewing punitive damages [must] consider three guideposts:  (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  [Citation.]"  (*State Farm Mut. Auto. Ins. Co. v. Campbell*, *supra*, 538 U.S. at p. 418.)

67

"In deciding whether an award of punitive damages is constitutionally excessive . . . , we are to review the award de novo . . . . [Citations.]" (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172; accord, *State Farm Mut. Auto. Ins. Co. v. Campbell*, *supra*, 538 U.S. at p. 418.)

1.     *The disparity between the compensatory and punitive damages.*

We jump first to the second guidepost — the disparity between the compensatory and punitive damages. There is no "bright-line ratio which a punitive damages award cannot exceed. . . . [H]owever, . . . in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm Mut. Auto. Ins. Co. v. Campbell*, *supra*, 538 U.S. at p. 425.) "Absent special justification, ratios of punitive damages to compensatory damages that greatly exceed 9 or 10 to 1 are presumed to be excessive and therefore unconstitutional. [Citation.]" (*Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 367.) The ratio of punitive to compensatory damages here is $1 million to $59,634.91, or about 16.7 to 1.

2.     *The disparity between the punitive damages and civil penalties.*

Moving on to the third guidepost — civil penalties authorized or imposed in comparable cases — we note that the Song-Beverly Act authorizes a statutory penalty of up to double the compensatory damages. (Civ. Code, § 1794, subd. (c).)

The Nolans argue that the Song-Beverly Act penalty is not relevant, because the punitive damages were not awarded on the Song-Beverly claim, but rather on the fraud

and CLRA claims. However, they do not point to any other civil penalty that is any more relevant. "The third guidepost is less useful in a case . . . where plaintiff prevailed . . . on a cause of action involving 'common law tort duties that do not lend themselves to a comparison with statutory penalties' [citation] . . . ." (*Simon v. San Paolo U.S. Holding Co., Inc., supra,* 35 Cal.4th at pp. 1183-1184.) Statutory penalties for particular fraudulent acts are generally not more than treble damages. (See *id*. at p. 1184 and statutes cited.)

Thus, *Johnson v. Ford Motor Co.* (2005) 135 Cal.App.4th 137 (*Johnson*) held that, in a case like this, the Song-Beverly penalty is relevant, but not controlling. There, the evidence showed that Ford had fraudulently concealed a defect in the vehicle that the plaintiffs bought; it had also manipulated its vehicle buyback program to evade the Song-Beverly Act. (*Johnson*, *supra*, at pp. 140-143.) As here, the plaintiffs asserted claims under the Song-Beverly Act, the CLRA, and for fraud. (*Id*. at p. 141.) The jury awarded compensatory damages of $17,811.60 and punitive damages of $10 million. (*Johnson*, *supra*, at p. 143.)

Regarding the third guidepost, the court said, "[T]he Song-Beverly Consumer Warranty Act is the most comparable statutory regulation of the kind of conduct involved in this case. . . . Here, however, the jury found, in essence, that defendant intentionally concealed information with the *intent* to defraud plaintiffs. . . . [I]n our view, the comparison with Song-Beverly does not begin to justify the $10 million punitive damages award, but neither does Song-Beverly represent a legislative determination that

69

punitive damages for the intentional conduct before us must be limited to the lower end of the ordinary range of such damages." (*Johnson*, *supra*, 135 Cal.App.4th at pp. 148-149.)

Applying *Johnson* here, the maximum Song-Beverly penalty "does not begin to justify" the $1 million punitive damages award. The award must be justified, if at all, based on reprehensibility. However, if Ford's conduct was sufficiently reprehensible, the maximum Song-Beverly statutory penalty does not set a ceiling on a punitive damages award.

### 3. *Reprehensibility*.

The key question, then, is whether Ford's reprehensibility here provides "special justification" for a ratio of 16.7 to 1.

"'[C]ourts [must] determine the reprehensibility of a defendant by considering whether: [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident. [Citation.] The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." (*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 419.)

"On appeal, '"determining the 'degree of reprehensibility' ultimately involves a legal conclusion . . . "'" [Citation.] '[F]indings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference.' [Citation.]" (*Rubio v. CIA Wheel Group* (2021) 63 Cal.App.5th 82, 96-97.)

a.       *The nature of the harm.*

Although *State Farm* used binary phrasing — whether the harm is physical or economic — the nature of the harm is not either black or white but a spectrum. For example, causing bruises is less reprehensible than causing quadriplegia.

In the face of *State Farm*'s binary phrasing, courts have held that mental or emotional harm can be deemed to be on the physical end of the spectrum. (E.g., *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 713 ["the harm to Roby was 'physical' in the sense that it affected her emotional and mental health, rather than being a purely economic harm."].) "'[P]unitive damages can — and traditionally do — consider the effects of the tortfeasor's conduct on the victim's mentality, not just his pocketbook.' [Citation.] 'The [United States] Supreme Court has recognized conduct causing emotional as well as economic harm can be more reprehensible than conduct causing mere economic harm.' [Citation.]" (*King v. U.S. Bank National Assn.* (2020) 52 Cal.App.5th 728, 778.)

On the same spectrum, emotional harm that causes physical symptoms (or at least a diagnosed mental ailment) deserves more weight than other emotional harm. (Compare *Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 559-560 [plaintiff suffered "weight

71

gain, bouts of crying, loss of sleep, physical tension, and tightness in his chest"] with

*Nickerson v. Stonebridge Life Ins. Co.* (2016) 5 Cal.App.5th 1, 16-17 [plaintiff "felt

upset, frustrated, angry, and betrayed"].)

Here, there was almost no evidence of emotional distress.[10] The Nolans testified

that they always worried about the truck breaking down. When it broke down on trips,

Mr. Nolan felt he had let his family down. If only from their many difficulties with the

truck, it is inferable that the Nolans did suffer some emotional distress. However, there

was no evidence that it led to any physical symptoms. This case is on the lower end of

the emotional distress continuum and hence in the lower midrange of harm.

        b.     *Indifference to or reckless disregard of health or safety.*

In evaluating Ford's state of mind, it is important to focus on the conduct that

made Ford liable under the CLRA.

There is no evidence that Ford ever became aware of the incomplete combustion

"root cause" that Lepper identified.[11] Rather, over time, by tracking warranty repairs, it

found that individual parts were failing excessively — fuel injectors, EGR valves, EBP

sensors, etc. Exhibit 47 noted that Ford "d[id] not have a definitive repair action . . . to

properly address the concern universe." "[W]e . . . may experience repeat symptoms

---

    **10**    The trial court granted Ford's motion in limine to exclude evidence of "emotional distress damages." The Nolans do not claim that this was an error.

    **11**    The Nolans pointed to Exhibit 62, Freeland's presentation. He argued that all of the excessive warranty claims had a single root cause, namely leaks from the fuel injectors and the combustion chambers. This was *different* from Lepper's theory that they were due to incomplete combustion.

72

once certain repairs are performed . . . ."  Exhibit 189 said, "[T]here are no fixes on certain symptoms."  Ford's liability arose from its failure to disclose these excessive rates of failure, along with its inability to fix the failures, to the Nolans and to the public.

Lepper testified that the defects of the 6.0L engine impaired safety because (1) "oil leaks . . . affect the safety," (2) "[i]f you're driving along and your car dies," in traffic or in an intersection, that is "a significant safety risk," and (3) "lack of power," in an intersection or when "[g]oing up the on-ramp[] and blending into traffic," "presents a potential safety problem."  It is reasonably inferable that Ford was aware of these rather obvious risks, even if it did not know what was causing them.

On this record, then, Ford's failure to disclose did constitute indifference to the health and safety of others.

c.      *Financial vulnerability*.

The Nolans had working-class jobs.  To buy the truck, they made a $29,350 down payment and traded in their Chevrolet Suburban.  Once the truck kept breaking down, they were not in a position to buy a replacement.  After the truck became wholly inoperable, they had to move so one spouse or the other could bicycle to work.

However, they were only moderately financially vulnerable.  This is not a case where they lost their jobs or depleted their savings.  (Cf. *Contreras-Velazquez v. Family Health Centers of San Diego, Inc.* (2021) 62 Cal.App.5th 88, 106.)  There is no evidence that they lost any earning opportunities.  They did not get what they paid for — a classic economic injury; however, they did not suffer any additional economic injury as a result.

73

d.      *Repeated actions*.

Ford's blameworthy conduct consisted of inaction — failure to disclose. Thus, there are two ways of looking at whether it involved "repeated actions." In Ford's point of view, there was a single nondisclosure or, at worst, a single ill-chosen corporate policy of nondisclosure. From the Nolans' point of view, however, there was a new nondisclosure every time Ford sold a vehicle with the 6.0L engine.

We agree with the Nolans. Similar nondisclosures to multiple consumers have been deemed to be repeated actions. (*Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 647 [failure to warn that product could cause cancer]; *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 986 [same].) And for purposes of reprehensibility, this makes sense. Even assuming Ford made only one bad decision, it made it knowing that it could have an effect on many people. Moreover, Ford could have reconsidered as it continued to receive reports that parts of the 6.0L engine were failing excessively, but it did not.

We must be careful, however, not to give this factor too much weight in this case. Increasing the Nolans' punitive damages award because Ford engaged in similar conduct toward other buyers "creates the possibility of multiple punitive damages awards for the same conduct . . . . [Citation.]" (*State Farm Mut. Auto. Ins. Co. v. Campbell*, *supra*, 538 U.S. at p. 423.) This possibility is not hypothetical. The record shows that there was a class action against Ford. There are also references to other actions in California courts

brought by buyers who, like the Nolans, opted out of the class action. According to the Nolans, Lepper "ha[d] participated in 100 trials and depositions all on the 6.0-liter . . . ."

"[P]unitive damages previously imposed against [a defendant] for the same conduct in other cases, as well as possible future awards, are relevant in determining the amount of punitive damages required to sufficiently punish and deter, so long as they are shown to have identical issues. [Citation.]" (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1701.)

We recognize that "due process does not prohibit state courts, in awarding or reviewing punitive damages, from considering the defendant's illegal or wrongful conduct toward others that was similar to the tortious conduct that injured the plaintiff or plaintiffs." (*Johnson*, *supra*, 35 Cal.4th at p. 1204.) "[T]hat a defendant has repeatedly engaged in profitable but wrongful conduct tends to show that 'strong medicine is required' to deter the conduct's further repetition. [Citations.]" (*Id*. at p. 1207.) Here, however, it appears that if Ford's repeated conduct calls for strong medicine, Ford will get it, in repeated doses.

We have no *evidence* of how many other buyers of the 6.0L engine had the same problems with it to which Lepper testified. We also have no evidence of how many of them were placed in an unsafe situation as a result. We can say only that it was probably more than a few and less than all. Presumably, of course, not all of those affected sued. For that reason, Ford's repeated actions toward others do call for some upward adjustment of punitive damages in this case. A large upward adjustment, however, would

75

violate due process, because it would be based on speculation and therefore arbitrary, and also because it would pose a very real threat of multiple liability.

e.   *Intentional malice, trickery, or deceit.*

"This factor is of little value in assessing a California punitive damages award because 'accidentally harmful conduct cannot provide the basis for punitive damages under our law.' [Citation.]" (*King v. U.S. Bank National Association*, *supra*, 52 Cal.App.5th at p. 779; see also *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 86 ["Our obligation to conduct a due process analysis regarding punitive damages does not create an opportunity for [a defendant] to make an end run around [the jury's malice, fraud, or oppression] findings."].)

f.   *Reprehensibility Plus Wealth.*

It must be remembered that the reprehensibility subfactors go primarily to whether punitive damages should be awarded at all. Even where conduct is sufficiently reprehensible to support some award of punitive damages, it will be a rare case in which it is so reprehensible as to support a double-digit ratio.

On the whole, Ford's reprehensibility was moderately high but not extreme. Ford caused moderate harm to the Nolans. It displayed great disregard for the health and safety of others. However, this was tempered by the lack of evidence that any failure of any of the weak-link parts of the 6.0L engine had ever actually resulted in any injury to anybody. The Nolans were moderately financially vulnerable. Ford's conduct was repeated; as already discussed, however, because Ford is also exposed to repeated

punitive damages awards, this factor calls for a higher ratio, but not an extreme one.

Finally, Ford's conduct was characterized by oppression, malice, and/or fraud, but so is all conduct that that gives rise to punitive damages in California.

The Nolans ask us to additionally consider Ford's wealth. "It is certainly relevant for a reviewing court to consider the wealth of a defendant when applying federal constitutional limits to an award of punitive damages, thereby ensuring that the award has the appropriate deterrent effect, but the punitive damages award must not punish the defendant simply for being wealthy. [Citation.] As the high court said in *State Farm*, wealth '"provides an open-ended basis for inflating awards"' [citation] and 'cannot justify an otherwise unconstitutional punitive damages award' [citation]." (*Roby v. McKesson Corp.*, *supra*, 47 Cal.4th at p. 719.)

The question is whether the ratio of the punitive damages to the defendant's wealth is such that the punitive damages award will be an effective deterrent. "'[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.' [Citation.]" (*Simon v. San Paolo U.S. Holding Co., Inc.*, *supra,* 35 Cal.4th at p. 1185.)

In *Contreras-Velazquez v. Family Health Centers of San Diego, Inc.*, *supra*, 62 Cal.App.5th 88, the court found that the defendant's "conduct was moderately reprehensible." (*Id*. at p. 108.) The defendant's net worth was $213 million. (*Id*. at p. 110.) However, "[t]he punitive damages award . . . was . . . $1,831,290 — quite a

large figure." (*Ibid.*)  Hence, the defendant's wealth did not justify a ratio of more than 2 to 1 between the punitive and compensatory damages.  (*Ibid.*)

By contrast, "[i]n some cases, the defendant's financial condition may combine with high reprehensibility and a low compensatory award to justify an extraordinary ratio between compensatory and punitive damages.  [Citation.]" (*Simon v. San Paolo U.S. Holding Co., Inc., supra,* 35 Cal.4th at p. 1186.)  Here, Ford's net worth, $36.469 billion, was extremely high.  The compensatory damages, $59,634.91, were very low (only a little more than double the minimum for an unlimited civil case, Code Civ. Proc., § 86, subd. (a)(1)).

*Nickerson v. Stonebridge Life Ins. Co.*, *supra*, 5 Cal.App.5th 1 is loosely analogous and provides helpful guidance.  There, the plaintiff's insurance company wrongfully refused to pay part of his claim for hospitalization costs.  A jury awarded the plaintiff $35,000 in emotional distress damages and $12,500 in attorney fees.  (*Id.* at p. 13.)  The trial court reduced the jury's punitive damages award to $350,000.  (*Id.* at p. 14.)

The appellate court found that four out of five of the reprehensibility factors applied:  (1) the harm was economic, not physical; but (2) the defendant acted with indifference to, and a reckless disregard of, the health or safety of the plaintiff and others; (3) the plaintiff was financially vulnerable; (4) the defendant's conduct involved repeated actions; and (5) the harm was the result of intentional deceit.  (*Nickerson v. Stonebridge Life Ins. Co.*, *supra*, 5 Cal.App.5th at pp. 16-23.)  It upheld a 10 to 1 ratio of punitive

damages to emotional distress damages, based not only on the defendant's "high degree of reprehensibility" (*id*. at p. 20), but also on the "relatively small economic damage award" as compared to the defendant's "$368 million net worth." (*Id*. at p. 26.) It rejected the plaintiff's request for a ratio larger than 10 to 1 as unconstitutional. (*Id*. at pp. 26-27.) Finally, it held that the relevant compensatory damages figure included the attorney fees (*id*. at p. 27), resulting in a lower ratio of 9.33 to 1.

Here, similarly, Ford's reprehensibility was moderately high. At the same time, the compensatory damages were to Ford's net worth as a mosquito bite is to an elephant. Hence, an award of punitive damages at the high-water mark of 9 to 1 is called for. We are not convinced that any lesser ratio will be adequate to deter and punish. At the same time, we are not convinced that there is any special justification for any greater ratio. Accordingly, we will reduce the punitive damages to $536,714.19.

X

PREJUDGMENT INTEREST

In their cross-appeal, the Nolans contend that the trial court erred by denying preverdict interest and by basing prejudgment interest on the wrong interest rate.

A.     *Additional Factual and Procedural Background*.

The Nolans filed a motion for prejudgment interest. They sought:

(1)  Interest at ten percent on the purchase price of the truck from the date of the purchase through the date of the verdict;[12] and

(2)  Interest at ten percent on the compensatory and punitive damages from the date of the verdict through the date of the judgment.

The trial court ruled that the appropriate interest rate was seven percent, not ten percent.  It denied prejudgment interest for the period before the verdict, because until then, the amount of damages was not certain.  However, it did grant prejudgment interest for the period between the verdict and the entry of judgment.

B.      *The Appropriate Interest Rate*.

The prejudgment interest rate on damages for breach of contract is ten percent, unless the contract provides otherwise.  (Civ. Code, § 3289, subd. (b); see also Cal. Const., art. 15, § 1.)  The California Constitution provides that prejudgment interest rate on all other damages is seven percent.  (Cal. Const., art. 15, § 1; *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1585-1586; Wegner et al., Cal. Practice Guide: Civil Trials and Evidence, *supra*, ¶ 17:1137 at p. 17-235.)

The Nolans contend that, under the California Constitution, because their claim arises out of the purchase of a good primarily for use for personal, family, or household purposes, a ten percent rate applies.  This contention is frivolous.

---

[12]      Alternatively, the Nolans sought interest at ten percent on the compensatory damages under the Song-Beverly Act from the date of the complaint through the date of the verdict, citing Civil Code section 3287, subdivision (b).  The trial court ruled that Civil Code section 3287, subdivision (b) does not authorize prejudgment interest on a Song-Beverly claim.  The Nolans have abandoned this theory on appeal.

The Constitution says: "The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum *but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing* for a rate of interest: [¶] (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum . . . ." (Cal. Const., art. 15, § 1, subd. (1), italics added.)

The Nolans' damages are not on any "loan or forbearance." The Nolans and Ford did not "contract in writing" for any interest rate that Ford was to pay. Hence, it is irrelevant that the truck was primarily for personal, family, or household use. The applicable interest rate was seven percent.

C.      *The Certainty of the Amount of Damages*.

Civil Code section 3287 governs prejudgment interest. Subdivision (a) of that section, as relevant here, provides: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . . ."

"Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of the statute if the defendant actually knows the amount of damages or could calculate that amount from information reasonably available to the

81

defendant. [Citation.] In contrast, damages that must be determined by the trier of fact based on conflicting evidence are not ascertainable. [Citation.]

"Thus, the general rule is that damages are unascertainable if the amount of damages depends on disputed facts or the available factual information is insufficient to determine the amount; and damages are ascertainable if the only impediment to the determination of the amount is a legal dispute concerning liability or the measure of damages." (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 150-151.)

"""On appeal, we independently determine whether damages were ascertainable for purposes of the statute, absent a factual dispute as to what information was known or available to the defendant at the time" [citation].' [Citation.]" (*State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1038.)

The Nolans argue that the purchase price of the truck was certain. However, the purchase price was just one element of their compensatory damages.

The Nolans elected to recover compensatory damages under the CLRA.[13] As already discussed (see part VII, *ante*), on their CLRA claim, they were entitled to the purchase price of the truck, minus its market value at the time of purchase, plus the cost of repairs and any other incidental damages. However, its market value at the time of purchase — i.e., if its defects had been known at that time — was uncertain. In fact, no

---

[13] The Nolans concede that their compensatory damages under the Song-Beverly Act "are not as easily ascertainable" as under the CLRA.

witness ever testified to that amount. Moreover, no one could possibly have known the amount of the cost of repairs at the time of purchase; it accrued over time.

The Nolans argue that they "were entitled to seek, and could rightfully be awarded," the full purchase price, on the theory that the truck was worthless at the time of purchase. However, that was not the only possible award. The jury determined that the truck was worth $3,380 at the time of purchase, and in part VII, *ante*, we upheld that finding. It could also have accepted Ms. Nolan's deposition testimony that the truck was worth $8,000 or Kalis's testimony that it was worth $6,000 to $8,000.

As the Nolans point out, damages that are """"readily ascertainable by reference to well-established market values"""" can be sufficiently certain. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 991.) Here, however, there were no "well-established market values" that applied to the truck. No Kelly Blue Book (or similar) valuation was introduced; no such valuation would have accounted for the truck's many defects.

The Nolans also advert to the rule that "'[o]nly the claimant's damages themselves must be certain. Damages are not made uncertain by the existence of unliquidated counterclaims or offsets interposed by the defendant.' [Citation.]" (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 508-509.) The market value of the truck at the time of purchase, however, was not an offset; it was an integral element in the calculation of damages.

One could imagine a case where the plaintiff's damages consist of two components, one certain and one uncertain, which the jury must add together. Arguably,

that plaintiff should be entitled to prejudgment interest on the certain component, even if not on the uncertain component. However, we have found very little law on this. (See *In re Pago Pago Aircrash of January 30, 1974* (C.D. Cal. 1981) 525 F.Supp. 1007, 1016-1018.)

This is not that case. Here, the jury had to *subtract* an uncertain component from a certain component. Thus, there was not even a certain *minimum* amount for which Ford was liable. "The rationale for precluding prejudgment interest on unliquidated claims is 'that it is unreasonable to expect a defendant to pay a debt before he or she becomes aware of it or is able to compute its amount.' [Citation.]" (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 576.) It is unreasonable to expect a defendant to pay a debt when an uncertain amount must be subtracted from a certain amount.

The trial court therefore properly denied preverdict interest.

## XI

## DISPOSITION

The award of punitive damages is reversed. In all other respects, the judgment is affirmed. On remand, the trial court must enter a modified judgment reducing the award

of punitive damages from $1 million to $536,714.19.  In the interest of justice, each side shall bear its own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

MILLER
J.